## MATSON NAVIGATION CO. v. UNITED ENGINEERING WORKS.

(Circuit Court of Appeals, Ninth Circuit.   March 9, 1914.)

### No. 2251.

1. Contracts (§ 232*)—Contract for Repairing Vessel—Method of Determining Compensation.

Libelant made a bid for the making of repairs on respondent's steamship in accordance with specifications furnished by respondent. Respondent thought the bid too high, and it was then agreed that it should put a timekeeper on the work which should be done on a time and material basis at its reasonable value, but that if done according to the specifications it should not cost respondent more than the sum named in the bid. In doing the work the specifications were by mutual consent departed from in so many respects and to such an extent that it was impossible to apportion the work between what was done within the bid and that which was without and beyond it. *Held*, that under the agreement libelant was entitled to recover for the entire work on a quantum meruit on a time and material basis.

[Ed. Note.—For other cases, see Contracts, Cent. Dig. §§ 1071–1094; Dec. Dig. § 232.*]

2. Evidence (§ 354*)—Cost of Repairing Ship—Workmen's Time Cards.

Under the system followed in a shipbuilding and repair works, in order to keep track of the work and material expended on each particular job, each job was numbered and each workman turned in daily to his foreman a time card showing the length of time he had worked on a particular numbered job and the kind of work he had done. This card was checked by the foreman. Material cards or orders issued by the foremen on which material was issued from the storeroom also showed the number of the job for which it was required. From these cards and orders daily sheets relating to each job were prepared and the items charged therefrom on the books. *Held*, that in a suit to recover for repairs made on a ship, on a time and material basis, such time and material cards, properly identified by the workmen who made them or the foreman who checked them, none of whom had any present recollection of the items thereon, were admissible in evidence, as were also the daily sheets which had been submitted to and approved by the timekeeper employed on the work by the shipowner.

[Ed. Note.—For other cases, see Evidence, Cent. Dig. §§ 1432–1483; Dec. Dig. § 354.*]

Appeal from the District Court of the United States for the First Division of the Northern District of California; John J. De Haven, Judge.

Suit in admiralty by the United Engineering Works against the Matson Navigation Company. Decree for libelant, and respondent appeals. Affirmed.

E. B. McClanahan and S. H. Derby, both of San Francisco, Cal., for appellant.

Nathan H. Frank and Irving H. Frank, both of San Francisco, Cal., for appellee.

Before GILBERT and ROSS, Circuit Judges, and WOLVERTON, District Judge.

---

*For other cases see same topic & § number in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

WOLVERTON, District Judge. This is a libel in admiralty. The United Engineering Works is the libelant and the Matson Navigation Company the respondent. For convenience, the parties will be referred to hereinafter as the United or libelant, and the Matson Company or respondent.

The Matson Company is the owner of the American steamer Hilonian, and the libel charges that, between the months of July and December, 1909, the libelant, at the special instance and request of respondent, furnished certain materials and performed certain labor upon the Hilonian, as set forth in Schedules 1, 2, and 3 annexed to the libel, and that the charges extended in said schedules are just and reasonable. These amount to

| | | |
|---|---|---|
| Schedule 1.......................................................... | $30,018 | 83 |
| " 2.......................................................... | 170 | 06 |
| " 3.......................................................... | 766 | 96 |
| Total...................................................... | $30,955 | 85 |
| Against which is a credit....................................... | 520 | 01 |
| Leaving a balance due of....................................... | $30,435 | 84 |

For a second cause it is alleged that further materials were furnished and labor done and performed upon said steamer as particularized and set forth in Schedules 4, 5, 6, 7, 8, 9, and 10 annexed to the libel. The demands under these several schedules are as follows:

| | | |
|---|---|---|
| Schedule 4.......................................................... | $ 616 | 88 |
| " 5.......................................................... | 190 | 00 |
| " 6.......................................................... | 140 | 00 |
| " 7.......................................................... | 140 | 00 |
| " 8.......................................................... | 1,350 | 00 |
| " 9.......................................................... | 1,140 | 00 |
| " 10.......................................................... | 725 | 00 |
| Total...................................................... | $4,301 | 88 |

The answer to the first cause of libel admits that the libelant furnished certain materials and performed certain work upon the Hilonian; but, as it pertains to the matters and things set forth in Schedule 1, it is alleged that the materials and labor were furnished and performed under an express contract for a consideration of $11,749, but:

"That during the progress of said work it was mutually agreed that certain omissions, modifications, and changes in said specifications and the work to be performed under said contract should be made, and the same were made and omitted without an agreement between the parties as to the value of said omissions, changes and modifications."

And:

"That certain work and materials were also furnished to said steamer by said libelant during said period of time * * * in addition to the work and materials called for by said contract, and for which no price was agreed upon other than that the same would be compensated for at its just and reasonable value."

It is then further alleged that certain work and materials were omitted of the value of $1,398.25, and additional work and materials

were furnished of the value of $8,280.50, leaving due the libelant upon the contract and for work and materials furnished the sum of $18,631.25.

As it relates to Schedules 2 and 3 it is stated that the United did furnish certain materials and supplies and perform certain work "without any agreement as to the price," but that the same was of no greater value than $937.07, which is the aggregate of the two Schedules 2 and 3. The right, however, is reserved to respondent of proving at the trial that such materials and services were worth less than that sum.

The answer to the second cause of libel admits liability as to each of Schedules 4, 5, 6, 7, 8, 9, and 10, except two items contained in Schedule 4, namely, to "Remetal horse shoes," etc., $146.88, and to "Grind off I. P. piston rod," etc., one-half of same $25, and two items of Schedule 9, being "Enlarged casing $60," and "Made new top for breeching," etc., $180.

As a separate answer to both causes of action a credit of $535.76 is claimed.

An analysis of the pleadings reduces the issues practically to a controversy touching Schedule 1 and two items each in Schedules 4 and 9. The respondent reserved the right to show that the work and materials performed and furnished as stated in Schedules 2 and 3 were worth less than the amount charged, but no proof was offered to the purpose, so that these schedules may be eliminated from further inquiry.

The libelant, both in the pleadings and at the trial, has proceeded upon the theory that the work done and materials furnished for the repairs upon the Hilonian were done and furnished under a time and material contract; the respondent tacitly agreeing to pay what the same was reasonably worth. The respondent has contended and is contending that the parties dealt with each other under an express contract, but that in its observance certain changes were made, by mutual agreement, by way of omissions, modifications, and additional services to be rendered, and that, in so far as other work was done and materials furnished instead of such as were stipulated for in the specifications, it was agreed that one should be in compensation for the other, and the additional services were rendered without any agreement as to the value thereof. Its theory, therefore, of the situation is that the integrity of the contract has not been overthrown by the omissions, modifications, and changes made, and that libelant was bound to its performance for the consideration therein named; otherwise it is conceded that the libelant is entitled to pay for the extra services rendered and materials furnished upon a quantum meruit basis.

The libelant, of course, has the burden of proof of establishing in the first instance that it is entitled to recover under the theory it has adopted, which involves proof of the work done and materials furnished the Hilonian, together with their reasonable value, for it is upon this basis it must recover, if at all. The respondent, on the other hand, has the burden of proving that the contract was duly en-

tered into between the parties, and not only this, but that it has so continued in its integrity, notwithstanding the changes and modifications imposed upon it in its treatment by the parties, as to be susceptible of enforcement. Under this theory, there necessarily must be an identification of the work done and materials supplied that are properly referable to the contract and a segregation therefrom of the time and material obligations. In this way only can we hope to arrive at a true understanding of the correlative engagements and ultimate liabilities of the parties.

[1] It will be convenient to inquire, first, whether any contract was entered into between the parties touching the repairs on the Hilonian, and, if so, what its nature was. In this connection, we will also ascertain what Putzar's true relations were to the parties concerned.

Carl E. Klitgaard was chief engineer upon the Hilonian, and as such he prepared, at the instance of the Matson Company, certain specifications for repairs designed to be made upon the vessel. The specifications contained 15 different items, with a statement at the bottom that time would be an important factor in awarding the contract, and fixing a limit of 26 days from August 23, 1909, for doing the work. With these in hand, the Matson Company advertised for bids. The United, among others, submitted a bid of $11,999. This was rejected, and bids were again called for. On August 2d the United submitted another bid, in language following:

"We hereby respectfully submit a figure of eleven thousand seven hundred forty-nine ($11,749.00) dollars on the repairs to the above steamer, all to be in strict accordance with the specifications and further we guarantee to finish the work therein specified in twenty-five (25) calendar days from the date of delivery of vessel at our yard."

After the bid had been received, Gray, who was the secretary of the United, was called into Matson Company's office by telephone, when the parties came to whatever understanding was had respecting the contract. Matson testifies:

"I felt that the bids were still higher than they should be, and he (Gray) suggested to me that we put a timekeeper on and he would guarantee that he would do the job within that figure, and if the crank-shaft did not have to come out there would be a reduction of a couple of thousand dollars. * * * I told him I would give him the job and accept his bid."

There had previously been some talk and discussion respecting the crank-shaft, as to whether it would be necessary to take it out of the vessel and to the shop for making the needed repairs, which could not be determined until there was a proper inspection while yet in the vessel. According to Matson the bid was accepted about the 17th or 18th of August. Mr. E. L. Putzar was put on the job as timekeeper. Putzar's name was probably first suggested for this position by Gray. Matson relates that Putzar was engaged for that purpose, and that his duty was "only to keep time on the repairs of that ship," and that no other authority was given him by witness. Matson was absent in the East a good part of the time while the repairs were being made, and Klitgaard, the chief engineer, and Capt. Saunders were left in charge of the work for the Matson Company. Matson further relates that Capt. Saunders gave Putzar the job. Further,

with relation to the contract, Matson says that Gray guaranteed the work "would be done within that limit of twelve hundred dollars, or whatever it is, I have forgotten now, and if it was any less we would get the credit for it," and that under these circumstances the Matson Company was to keep time on the job, and provide a timekeeper for the purpose. On cross-examination Matson testified as follows:

"Q. What did you say to him (Gray) upon this subject, and what did he say to you upon this subject?  A. He said he would take that job and guarantee the Matson Navigation Company that he would do the job within those figures, $11,749.  Q. And what did you say?  A. I told him I would accept it. Q. Is that all the conversation? Why should he guarantee that he would do it within those figures when his written bid was those figures?  A. I told him I still felt that he was high, and I would put a timekeeper on over there and see how that would come out, and there was a crank-shaft—  Q. (Intg.) Just one moment. You say you put a timekeeper on there; why did you put a timekeeper on? What was the conversation between you and him respecting that?  A. You do not seem to give me a chance, or you did not catch my answer. I say I told him I would put that timekeeper on and to see that we would get a reduction on that crank-shaft which we expected would come out on that day. * * * Q. Then am I to understand your present contention to be that you simply put on a timekeeper to ascertain what the difference would be in the cost in case the crank-shaft did not have to come out for repairs in the manner that you have testified to?  A. I think so.  Q. That is the only thing you put a timekeeper on for?  A. That is the only thing he was there for.  Q. The only thing, that is, to keep time on the crank-shaft job?  A. To keep tab on everything around there with regard to time."

Further on the witness says:

"I told him (Gray) I would accept his bid with the understanding that if it could be done for less money I was to get credit for it. * * * What was said when I gave the contract was that I was to put on a timekeeper there, and we were to get the benefit of a couple of thousand dollars if the crank-shaft did not come out."

The instructions given Putzar were "to keep time on everything."

Charles W. Saunders, the superintendent of the Matson Company, testifies to a conversation between Capt. Matson and Gray relating to the alleged agreement as follows:

"When Mr. Gray came in, the Captain said: 'Well, Gray, I have decided to give you the job, although I still think the bid is too high, but I want an understanding with you that if the crank-shaft does not have to come out of the ship we will get an allowance from the bid. I am going to put on a timekeeper, as you suggested, for the purpose of getting that reduction.' That is about all of the conversation, except that Mr. Gray said, 'Thank you.' I think that is about all."

Carl E. Klitgaard, chief engineer on the Hilonian, and who had charge of the work attending the repairs, says that Putzar was timekeeper on the work.

Mr. Gray, the secretary of the United, denies emphatically that he ever made any suggestion to Capt. Matson that he would make a reduction of a couple of thousand dollars in his bid if the crank-shaft did not have to come out. Gray further testifies, on cross-examination, touching the subject of the contract, as follows:

"Q. And it was known at the time of the submission to you of the specifications that that would make some difference in the course of the work?  A. Providing the specifications were complied with, yes; certainly it would make

a difference whether the shaft would come out or be left in position. Q. I say that was known to you at the time the specifications were submitted to you? A. Exactly. Q. Now, your bid of $11,749, as embodied in 'Christy Exhibit B,' included the removal of the crank-shaft in accordance with the original specifications, did it not? A. Yes; oh, yes. Q. What was the understanding about this undetermined matter of the taking of the crank-shaft out? A. Well, there was a timekeeper sent to the yards to look out for the job as a whole, and he was supposed to determine what the loss or what the saving would be. Q. And if there was a saving the Matson people would get the credit for it? A. Most assuredly they would have got the credit for it; that is what they put the timekeeper on the job for. Q. Now, is that your writing, Mr. Gray, upon here (pointing)? A. No, that is not my writing. Q. I refer to the following: 'This bid submitted on account of its being worth $250 to have vessel and (at) U. E. Works to complete work already contracted for in the shape of retubing donkey boiler and retubing Howden system, etc., per Capt. Saunders.' (This memorandum was noted on the bid in pencil.) A. No, that is not my writing. Q. But it was in accordance with your idea at the time, was it not? A. I told Saunders that—yes, that was the reason that we cut our figure. Q. Cut your figure from the former bid? A. Because I had quite a bit of work on there. I had that pump to install and all these jobs that were mentioned here. Q. And it was your desire to have the ship over there, and it was worth $250 in your judgment? A. It was worth $250 to get it over there. It would have cost me that, or probably more to have done it in some competitor's yard. Q. Was that your reason for coming down in your bid? A. That is the reason I cut the figure. Q. You remember the meeting in Capt. Matson's office when the bid submitted by you and the Risdon and the Union was rejected, do you not? A. It was rejected. Q. You were there, were you not? A. Whether he rejected that positively at that time, or not, I could not tell you. Q. Don't you remember that you waited and had a private talk with Capt. Matson after the other two men from the Risdon and Union had left? A. Well, I remember he took exception to the price at that time, and said he thought it was too high. Q. And don't you remember— A. (Intg.) That is where it rested. Q. And don't you remember at that time this timekeeper was suggested to keep track of the work so that you could find out what the reduction would be? A. It was generally understood there was going to be a timekeeper on the job, after he had come to the conclusion that they were not going to let it out on a contract; that was understood. Q. It was understood? A. After it was understood that they were not going to put it out on a contract we all understood at that time, we knew there was going to be a timekeeper on the job. Q. After who understood it was not going to be let out on a contract? A. After I and Matson and all of them; they came to that decision; they were not going to let it out on a contract. Q. Do you mean to say that this bid of August 2d, being 'Christy Exhibit B,' was not accepted by the Matson Navigation Company? A. He did not accept it. That is the reason he sent the timekeeper over there. Q. Answer the question directly—that bid was not accepted? A. No, he did not accept it. Q. He did not accept it? A. He did not accept it. Q. You are not confusing your statement with your first bid which is embodied in Christy Exhibit A of July 27th? A. He didn't accept that either. Q. He didn't accept either of them? A. No. Q. Will you please, now, Mr. Gray, tell me the circumstances under which that bid was rejected, the last bid, Christy Exhibit B? A. Matson made the statement that he was dissatisfied with the price and thought it should be done for less money. Q. That is what Capt. Matson said? A. That is what he told me, and he said he was going to send a timekeeper to the yards to get the benefit of whatever saving he could get on the job. Q. Saving on what job? A. Below this price; he claimed that that price was too high. Q. Did you say that you would do it for that money? A. Did I say I would do it for that money? If they stuck to the specifications, certainly. Q. And he said that he would not pay you that price? A. His idea was that it was too much. Q. I want to know what he said. A. He did not say he would not pay it. Q. What did he say? A. He said he was dissatisfied with it, he felt it was too high, and he was going to send a timekeeper to the yard to keep track of the time on the job. Q. And it was to be

a time and material job?   A. Time and material job under those conditions. I told him, I said, 'If those specifications are adhered to, I will see that it don't cost any more than $11,749.'   Q. In other words, that was an outside price?   A. A limiting price.   Q. It should not cost more than that?   A. Not any more than that.   Q. So, then, you and he did have a contract by which this work was to be done in strict accordance with the specifications not to exceed $11,749?   A. Well, I told you what I said.   I don't know as I have anything more to say regarding it."

Questioned further on the subject, the witness answered:

"It seems to me that I proposed to do a certain amount of work for a given sum, and Matson would not accept it, and he said he would put a timekeeper on and see if he could not save himself some money; it seems to me that answers it."

Still later he says:

"There was a timekeeper sent to the yards to look out for the job as a whole, and he was supposed to determine what the loss or what the saving would be."

That Putzar kept time on the work in making the repairs while in progress, there is no question, but he kept the time on the ship only, and not in the shop.

That there was an understanding between the parties respecting the repairs on the Hilonian prior to entering upon the work, there can be no doubt, and that the bid of August 2d was not accepted as made is equally certain.   The minds of the parties did not come to rest on that basis.   Capt. Matson thought the bid was too high, and on that account would not agree to it.   It was uncertain whether the crank-shaft would have to come out and go to the shop.   If not, it would make a difference in the amount of work to be done, and thereby reduce the consideration for doing the same.   This may have had some bearing in inducing Matson not to accept the bid as made, but it was not, to our minds, the dominant cause that prompted his action in the premises.   He was dissatisfied with the consideration as a whole, and was determined not to pay it, as he deemed it too high. The matter of the crank-shaft was discussed, and Capt. Matson insists that his company was to have a reduction in the price named in the bid, which it was estimated at the time would amount to about $2,000, if the crank-shaft did not have to come out, and that Putzar was put in as timekeeper for the purpose only of ascertaining the difference in cost in doing the work on that basis.   Gray denies flatly that such was the purpose of having the timekeeper, but asserts that such timekeeper was employed exclusively by the Matson Company for the purpose of determining the cost of the work on a time and material basis, and that, if the work on such basis did not amount to as much as the bid, the Matson Company should have the benefit, but that in any event the amount of the bid should be the outside price for doing the work.   Putzar did not confine his work in keeping time to the work on the crank-shaft only, but kept the time on the ship for the whole of the work done, in making the entire repairs.

We are satisfied from a review of the testimony, without going into details respecting the subject, that Putzar was in the sole employ of the Matson Company, that what he did as timekeeper was done

under the direction of that company, and that he was in no way or manner the employé or agent of the United. The fact that Putzar kept time on so large a proportion of the work, notwithstanding he did not keep time in the shop, is itself significant as an interpretation of the ultimate agreement of the parties with respect to the repairs. If the bid had been accepted as made, there would scarcely have been any necessity for the Matson Company to put a timekeeper on to check up the time consumed in doing the work. And so, if there was to be a reduction as respects the crank-shaft only, in case it did not have to go to the shop, there would have been no necessity of keeping the entire time on the ship. But the keeping of such time under the explicit direction of the Matson Company is consistent with Gray's understanding of what the contract was as finally understood between the parties. A further circumstance which seems to confirm Gray's understanding is that, according to the estimates made by Heynemann and Gardner, two expert witnesses called by the respondent to show the value of the entire services rendered, the value of the work omitted on account of not having to remove the crank-shaft to the shop was only $1,398.25, a sum greatly below the $2,000 which Matson claims was the sum that Gray agreed would be the probable difference.

Upon the whole, we conclude that the true understanding of the parties was that the United should do the work contemplated by the bid for a price not exceeding the consideration named therein, but that the Matson Company should put its own timekeeper on the work for the purpose of checking up the United as the work progressed, and that, if it was done for less than the sum named in the bid, the Matson Company was to have the benefit. In effect, the contract when concluded was that the work was to be performed on a time and material basis at its reasonable value, but that it should not cost the Matson Company more than the consideration named in the United's bid. This we firmly believe was the understanding of the parties when the work was entered upon by the United, and in the end we must determine how well the agreement thus concluded was adhered to by the parties, and, if departed from, the extent of such departure and the effect thereof.

As premised at the outset, the libelant has the burden of proof to establish its theory of the case, namely, that the work was done by mutual understanding, for what it was reasonably worth, with the consideration named in the bid as an upset price. We will now ascertain whether libelant has made a case under the evidence upon this basis, leaving for further consideration the question whether the parties have adhered to or departed from their agreement; and the effect of their action in this regard.

[2] To establish libelant's case upon this theory, it has introduced a vast number of time and material cards, as they are called, designed to show what was done as the work progressed, and certain time sheets kept by Putzar, as well as the accounts kept and made up and rendered by the United. The time cards are made up as follows: Every workman is given a shop number, and every job that comes

into the shop is given a job number. This number is painted on the work as it is sent out to the workmen, so that each workman may know upon what job he is called to do work. When the workmen enter upon their day's labor, each one is given a card, and each is required to make a record of his time at work upon the card given him. This he does by entering his shop number and his name in appropriate blanks, the job number upon which he may work during the day in a column·headed, "Job Number," the hours worked on each job in another column headed, "Hours Worked," and the pieces worked upon in another column headed, "Article Worked on." Another column contains the heading "Piece Number." What use is made of this column does not appear. Thus, when the day's work is done and the card made out by the workman, it may show that the workman has employed his time on one, two, or more jobs, and always the time given to each. job and the piece or article worked upon pertaining thereto. A card entitled, "Time Card," printed in brief of counsel for respondent, shows, "Shop No. 316," date illegible, "Name J. L. Chandler," "Occupation 23." In the column headed, ·"Job Number," appear the figures 5378, 5325, and 5295; opposite the first number in column headed "Hours Worked" the figure 1, opposite the second number the figure 4, and opposite the third the figure 4; opposite the first number in column headed, "Article Worked on," are found the words, "Circulator Eng.," opposite the second number, "Spring Bearings," and the third, "Main Bearings."

Thus is made up a complete record of what the workman has done during the day, and the job or jobs upon which he has employed his time. These cards are kept by the United, not only for keeping track of the work and the expense attending it done upon each particular job taken from others, but upon work done for itself, in order that it may be informed as to the cost attending the work. These cards, when made out, are handed at the end of the day's work to the timekeeper. In conjunction with this method of keeping the time of the workmen, each of them is required on entering the yard for his day's work to punch a time clock, which records the time of entry, and again when he leaves the yard, and thus is recorded the length of time that he has been engaged at work during the day. These clock cards are required to be signed by the men as they draw their pay. This operates as a check against the time reported by the men upon their time cards, and it is apparent that, in the total number of hours worked during the day, the time reported by the workmen upon their time cards and the clock records must agree.

Following a little further the manner of denoting the job numbers and checking up the time of the men, Robert Adamson explains it quite clearly. Adamson was a foreman in one of the departments, and his duty, among other things, was to keep track of the time of the men, check up their cards, and turn them in to the timekeeper. He relates that he is handed a printed order from the office with a list of work accompanying it, and when the work is brought into the shop from the ship he takes note of it to see that it is on the list. Finding it there, he puts the number of the job on it, and sees that it is taken

to the bench or lathe where the work is to be done upon it. The job numbers are contained in the printed order. Every separate boat under repairs is given a job number, one or more it may be, and it is by the job number that the officers and workmen are enabled to keep trace of the work that is being done on the particular boat or vessel. We quote here a little of Adamson's testimony:

"Q. That is, if there is one number you have one number for the ship, and if there are several numbers you have the several numbers. A. Several numbers, yes, and the different pieces are specified under that number, what jobs should be done, and what pieces are to be worked on, and what part of the machinery is to be worked on. That all comes under the heading for that. You see it will be stated what part of the machinery is to be worked on under a certain number. Well, all that part of the machinery that goes in that machine, that goes into the ship, is numbered according to that heading, under the heading of which it comes. Q. After you number it, what do you do with it? A. Get it delivered to the lathe, if it is to be turned, or planing machine, or whatever machine it is to be worked on; it is put there and goes to the charge of the man that is to work on it. Q. How is it put there, whether under your supervision, or how? A. Yes, I tell the man in the shop to deliver it to that machine, and I see that it is there, and I give the man his instructions about it. Q. You give the man his instructions? A. As to what is to be done. Q. That is, the man at the machine. A. Yes, sir. Q. What do you do with respect to the time or noting the time that the man at the machine takes the job and the time when he finishes it? A. I take note of when I give the man the job and I know when the job is finished, and the time it comes off that machine, and then I know what time he has been on it, I know how long it takes."

Adamson was enabled to recognize the time cards of the men over whom he had supervision in the main by his check marks found thereon in checking up the items, but by other means of identification also, and, being so recognized and identified, the cards were offered and admitted in evidence over objection. This is but an illustration as to how these time cards were proven.

As another illustration, George Allen was foreman blacksmith in the blacksmith shop. He checked up the time of his men every night, and recognized the cards by his signature upon them. And so of William Macdonald, chief draftsman, who also identified the cards by his signature, and of Charles Grotefend, foreman of the city shop, who distinguished the cards of his men by his initials, ·C. W. G. All the time cards offered in this way were objected to.

Along with these cards were offered in many instances the clock cards, they being identified by the same witnesses, which were also objected to by counsel for the respondent.

In a number of instances the men themselves were put upon the stand and identified their own time cards, in corroboration of the identification by the foreman.

Mr. Richard W. Curtis, who was chief clerk for the United, further describes the manner in which the accounts are made up. It was his duty to make all the charges and take care of the entire office force. That means all the timekeepers and clerical force on both sides of the bay. He had full charge of the timekeeping department, and departments in the yard, in so far that he kept in touch with every department regarding all the work going on in the yard, and the material that was being used in the different classes of work. In

the case of the Hilonian, as in other jobs, he looked after all the material and labor and kept in constant contact with the foremen of the different departments regarding the work. Respecting the time cards, he says:

"The time cards, after being checked up, were turned over to me each day, and I would look all the time cards over, and I would take these cards over to the yard, and upon any of them that I might find anything that was in doubt, or to my mind not satisfactory, I would call in the men and the foreman connected with that department, and question them regarding these cards and also the stock cards. I would then and there straighten out whatever difficulties might arise. Also regarding the timekeeper on the various ships, and also I might mention the 'Hilonian.' It was my duty to keep in constant contact with these timekeepers, and to check up with them daily as to the work performed on their ships, and correct any and all errors that might occur; in other words, make a daily adjustment with the timekeeper as to the labor performed on the ship."

He was then asked, "In the case of the 'Hilonian,' did you do that with Mr. Putzar, the timekeeper?" To which he replied, "Mr. Putzar was the timekeeper on the 'Hilonian,' and that being part of my duties, I checked up with him daily." The witness further testifies:

"After the jobs are finished it is my duty to take up the reports of each foreman; that is, I mean by the report, this list that was issued from the office that was given to the foreman to keep track of the work. I take these reports and after checking them up with the foremen consolidate that into a heading for the charge or the bill, and then they being of no further use to us we destroy them, because if we kept them all it would take a great deal of room, and secondly, as a general rule, they are very dirty and oily. Q. This heading is that the heading that appears at the head of the bill as seen on 'Exhibit No. 1' and the other exhibits attached to the complaint in this case (handing)? A. These headings are the result of the consolidation of the reports of the work furnished by the different foremen of the different departments of our yard. Q. What office do they perform as a record in the office of the United Engineering Works? A. They are the original record. It is the only record that we keep. Q. Now, with reference to the time cards and the material cards; what is done with them? A. The time cards and the material cards are turned in every day, and after they are all in they are, after being checked up daily by the different foremen, turned over to me, and I also go through them. In going through these cards I refer to the lists of the different foremen, and if I see anything that is wrong with the card, or that I think might be cloudy in any way, I refer to the foreman or the man on the job. After that is done, if there is a timekeeper on the job, he gets these cards to check up. Q. That is the ship cards you are speaking of? A. I am speaking of the ship cards, yes. Q. After he has checked them up, what becomes of them? A. After he has checked them up, and we arrive at a satisfactory settlement for the day's work, and the cards are duly checked, these cards are not kept.

"Q. You speak of the timekeeper checking them up. State whether or not in this case Mr. Putzar kept an independent record of the time. A. Mr. Putzar, to my knowledge kept a handbook, as all timekeepers do. What I mean by handbook is, they kept track of the men independently of our record. Then the cards were demanded each day by Mr. Putzar, and he checked them up with his handbook. I know this to be a fact, because I made it my business to ask Mr. Putzar each day if the cards were satisfactory, but in this case Mr. Putzar transcribed them onto the sheets and he checked them up on these sheets from his handbook. The time cards were then turned over to me with these sheets, and I checked the time cards with the sheets. Q. What did Mr. Putzar do in the way of certifying to the correctness of the sheets? A. Mr. Putzar had a form book and had a carbon sheet, and Mr. Putzar transcribed these cards onto the sheet. He would then sign the original, and turn

it over to me after being satisfactory both to himself and to me as to its correctness. Q. Now, with respect to the shop cards; what course would they go through? A. The shop cards, after being duly checked up by the foremen of the different departments, were turned in to the office. I would go over the shop cards with the timekeeper in the office. What I mean by going over them is this: I would take these cards and look over the lists of work and over the individual cards of the men, and check them up. If I saw anything that was wrong in any way or doubtful, I would call these men in. These cards were finally turned over to me then after due checking, and I segregated them and consolidated them in the charge that was rendered to the different ships, and to the charges rendered to the 'Hilonian' in this case. Q. What would finally become of those cards in case there was no dispute concerning them? A. If there was no dispute, and we did not hear anything regarding the bill but what was satisfactory, we did not keep these cards, because the accumulation was so great that we could not handle them, and they would be destroyed. Q. How does it happen, then, that you have in your possession the cards relating to this particular job? A. The cards in all cases are kept for a certain period. After that, if we do not hear any objection, we destroy them; but, if we hear that the parties concerned have any doubt as to any of the charges on the bill, we keep the card pertaining to that item or to that class of work. Q. The particular cards that have been offered in evidence in this case, who segregated them? A. The cards that were offered in evidence in this case I segregated myself personally. Q. And in whose possession were they up to the time of their being brought here? A. They were in my possession. Q. Is that the usual, ordinary, and customary course of keeping accounts of the United Engineering Works? A. Yes, sir; these cards, and the timekeeper, and this manner I have explained is the usual and customary course of keeping accounts of the United Engineering Works. Q. And the material tags? A. Yes, sir."

In further explanation of Exhibit 1, alluded to by the witness, it should be stated that it consists of 140 items descriptive of the work done, followed by an itemized statement of the material used, and the hours of labor performed on the job, and rate per hour charged. The account thus made up, under the heading designated, according to the witness, constitutes the original record; it being the only record kept. In this relation, it may be noted also that Curtis was enabled to recognize the time cards of some of the workmen who were not called and of others who testified in the cause.

In addition to the evidence thus adduced to establish libelant's case, libelant introduced the time sheets of Putzar, containing a record made by him of the workmen on the ship, and the time each was engaged as it pertained to the several job numbers designated relating to the repair work. This record was not entirely made up by Putzar. The sheets made up from September 17th on until the completion of the repairs are in the handwriting of Curtis, which Curtis explains was done at the request of Putzar. Putzar was unable to do the work for lack of time. But after the sheets were written up Putzar took them away, and on the following day returned them, stating they were correct, and signed them and returned the originals to Curtis. These time sheets were made up in duplicate, Putzar keeping one of them; the other, when signed by him, was delivered to Curtis for the United. The time sheets thus delivered to the libelant were received in evidence over the objection of respondent. But later in the examination of Curtis, the duplicates retained by Putzar were offered by respondent and received in evidence also.

It is claimed that Putzar did not keep an independent record from which to tabulate these sheets, but Curtis' testimony shows that he did, and he is corroborated by other witnesses. This independent record, if one was kept, should be in the hands of respondent. Putzar could have been called and the fact shown, if none existed, and the respondent not having called its own timekeeper leaves a presumption that the proof would not sustain its contention in that regard.

The materials required for the repairs are kept account of by the foremen of the different departments giving their written orders upon the storekeeper for each particular item of materials needed as the work is being carried on, and these are charged to the job numbers, so that it is readily ascertainable what material has been used in respect of each job number. The United has its storeroom where it keeps its supplies, with a storekeeper in charge, and the orders of the foremen are drawn upon the storekeeper and against these supplies. These orders bear their date and the job number, with a description of the articles or items of materials wanted, and a memorandum of what "used on," as "Hilonian Piston Rods," "Crank Bearings, Hilonian," "Rudder Hilonian," and the like, and are signed by the foreman giving the order, either by his initials or full name. These orders were identified in large numbers by the persons giving them, and were offered and received in evidence over objection.

As to the reasonableness of the work, Curtis testifies that it was usual, customary, and reasonable, and Gray that it was just under the conditions.

Now, the contention of respondent is that libelant has not made out its case even upon its own theory, and the strong grounds of that contention are that these time cards, the material and supply orders, and the Putzar time sheets were not competent evidence in support of libelant's case, or at least were not the best evidence, but that the men who had personal knowledge of the work done and materials furnished should have been called to establish the fact.

Beyond question, the Putzar sheets were competent evidence against respondent. They were written up by Putzar personally, or under his direction, and by him approved as correct. Putzar being the agent or representative of the respondent for the purpose of keeping time, and having kept the time of the men on the ship, his statements of account are binding on respondent as admissions made by it, and the Putzar sheets are therefore competent evidence to establish libelant's account.

As it otherwise pertains to the time of the men and the materials used in the repairs, it has long been established that original entries, made in the usual course of business, the entries having been made at the time the particular transactions were had, for the purpose of keeping account against the party to be charged, are competent evidence, of a secondary character, of the facts recorded by the entries. To render them competent, the person making the entries, and having primary knowledge of the transactions, must be shown to be dead or unavailable as a witness. But if the party making the entries is called to testify concerning them, and recognizes the entries to be his

or made with his knowledge of the fact, but has no independent recollection of the fact recorded, the original entries may be admitted, and constitute prima facie evidence for the consideration of the court or jury. 2 Wigmore on Evidence, §§ 1521, 1537; Merrill & Alderman v. Ithaca & Owego R. R. Co., 16 Wend. (N. Y.) 586, 30 Am. Dec. 130; Manchester Assurance Co. v. Oregon R. Co., 46 Or. 162, 79 Pac. 60, 69 L. R. A. 475, 114 Am. St. Rep. 863; Insurance Co. v. Weide, 9 Wall. 677, 19 L. Ed. 810.

In the present case the shop cards may well be regarded as original entries. They are not journal entries in the ordinary system used by business men and concerns in keeping their accounts, but they are individual entries in a card system devised for the purpose of keeping an expense account. Where the men making up the cards were not themselves called, their foremen were, who were practically as well acquainted with the facts recorded by the cards as the men. Neither the men nor the foremen were able to testify from independent recollection. Hence the cards were admissible as prima facie evidence of what they purport to state respecting the hours of work and the material used. Like proofs have been admitted in cases of much analogy to the present in the Seventh and Eighth Circuit Courts of Appeal. Mississippi River Logging Co. v. Robson, 69 Fed. 773, 16 C. C. A. 400; Wisconsin Steel Co. v. Maryland Steel Co., 203 Fed. 403, 121 C. C. A. 507.

The proofs further show that the account sued on, as it respects Schedule 1, was made up from these time and material cards and from the Putzar time sheets, and, having been so made up, we conclude the libelant is entitled to recover on the account, unless it be that the contract stands in the way of his recovery on this theory. Nor do we think that the testimony of Heynemann and Gardner is potent to overcome this conclusion. These men were both expert engineers, and have made an estimate of the cost of the repairs made on the Hilonian. The aggregate of the estimate is much less than libelant's demand. We think, however, that their estimate is less reliable than the statement of account by libelant for the reason that in making it up they had to rely wholly upon the representation of Klitgaard as to what repairs were made and the materials required to complete the work; the repairs having been fully completed and the ship turned over to respondent at the time. Being in this position, waiving the fact that Klitgaard was not himself under oath, it was impossible that they should have been fully advised in the premises so as to give a wholly reliable estimate of the costs of the work.

It being ascertained that the contract entered into was for making the repairs on a time and material basis at their reasonable worth, but with a limitation as to the ultimate cost, libelant was bound to do the work within that limitation unless relieved from the obligation by the assent of the respondent or the mutual concurrence of the parties. Many changes, modifications, and additions were made to the original contract. This is conceded. And the question is presented whether such modifications and changes have so destroyed the integrity of the contract as that it could no longer be performed in any part and the

segregation of prices made in conformity with the original intent and purpose of the parties. That is to say, notwithstanding the modifications and changes, whether the parties are still able to apportion the work done at the price agreed upon and that done on a quantum meruit basis, or whether under the conditions of the contract the prices are apportionable to the work done under and within the contract and that done without and beyond the contract.

It will be remembered that the specifications attending the contract for doing the repair work contained 15 different items. Now, following Siversen in his cross-examination. He says as to the first item:

"This work was done, and more work was done to the air-pump" than was specified.

And as to the further work:

"All parts of the air-pump was removed to the shop and put in the lathe to true up the faces. * * * And I think the air-pump bearing was bored out. * * * The part that the air-pump sits on was also bored out. * * * There were additional studs put into the condenser, under the holes."

As to specification No. 2, instead thereof a balance cylinder on low pressure was put in.

As to No. 3, that work was all done; and the same as to No. 4. But on redirect the witness Siversen says the work was done, but not in the way the specifications provided.

"The steel plates that are mentioned here were so corroded that it was concluded that we could not make a job of it by using them, and they were removed, and the guides were planed off on the back, and new and heavier steel plates were put on. * * * The shoes were made new; new shoes cast, and I think they were of a different pattern in some manner to what they had been before. * * * They were filled with metal (challenge metal), the part that goes up against the guide, and the part that goes up against the backing guide as well."

These changes were made after consultation with Putzar and Klitgaard.

As to No. 5, the witness says:

"There was some eccentric straps remetaled, but I don't remember which ones they were. I think though that the high pressure and the low pressure were among them, but I don't remember now if those straps were remetaled, or if there were brass liners cast for them; I think there was brass liners cast and placed in those straps. I might have that mixed up with some other job. I would not say, but I think there was some brass liners cast in semicircular form and screwed into the top half of the straps and fitted in that way, and also had to be offset on account of the liner from the valve stem to the eccentric not being fared. * * * I am not positive whether these brass liners, as I say, were put in there or remetaled, but I think it was the brass liners."

No. 6 was done and completed as specified.

No. 7 was not done as specified, but instead a bronze patch was put on and fitted for the bolts and pumped full of red lead putty. On redirect, the witness says No. 7 "was not done at all. * * * There was a patch put on the bed-plate, a bronze patch. Q. That is

an entirely different thing from what the specifications call for? A. Yes, entirely different from putting a column in, of course."

No. 8 was completed as specified.

No. 9 relates to the crank-shaft. "The work was all done with the exception of the removing of the crank-shaft and the boring of the bearings in place." And there was additional work. On redirect the witness further testifies that there is only one way to answer as to No. 9, and then proceeds to delineate the many particulars as to how the work was done.

No. 10, the work was done as specified.

No. 11, the work was all done, but other work was entailed in placing the plate "that was not originally calculated on."

No. 12 was done according to specification, but witness does not remember whether the bitumastic was covered with two inches of cement as called for.

As to No. 13, witness answered that he did not know. But on redirect, the witness Taylor says the work was all done "and a great deal more than the specifications covered." And as to this he testifies:

"Q. When the work was first pointed out to you to be done, was all the work to be done under that section 13 included that you did under that head? A. No, sir. Q. Why did you do so much more work under that head No. 13, from that which was originally pointed out as the work to be done under that? A. In the forepeak after it was filled with water and the bulkhead examined, it showed evidence of leakage around the ends of the stringers where they connect to the bulkhead, and I informed Mr. Christy of that fact, and they had a conference. * * * They decided to cut out the loose rivets and make up shoes and several other jobs. I don't recollect all that was done to that bulkhead."

As to No. 14, the witness Siversen does not know.

No. 15 was completed according to the specifications.

In corroboration of Siversen, Klitgaard, the chief engineer for respondent and the person who drew the specifications, says as to item No. 1 the studs on the air-pump were not enlarged as specified, "but additional studs were put in there."

As to No. 2, the work was not found necessary as called for in the specifications, but in compensation therefor it was agreed:

"That we would fit a 12-inch balance piston on top of the low-pressure valve pipe it up to the condenser and lengthen the valve stems, fit the nuts, etc., that were found necessary to fit the new conditions."

Mr. Wilhelmson, wrongly alluded to as Williamson in some parts of the testimony, denies that the new work was to be done as compensation for the old, or that any agreement of the sort was entered into. And Gray denies that any such agreement was made.

The witness Klitgaard further testifies that item 3 was completed as specified.

As to No. 4, he says:

"Instead of putting in these extra screw-stays which it calls for here, heavier plates were put on the back of the guides. Instead of reconstructing the H. P. and L. P. shoes as the specification calls for, there were new castings made."

And other changes are noted. As to this also, he further states that he and Wilhelmson agreed that the new work was to be in compensation for that specified. Again, Wilhelmson denies the agreement; so does Gray.

As to No. 5, Klitgaard admits the change practically as delineated by Siversen, but claims, as before, that the new work was done, under agreement with Wilhelmson, as compensation. This alleged agreement Wilhelmson and Gray both emphatically deny.

Item No. 6 Klitgaard affirms was completed as specified.

As to No. 7, he says:

"The iron column which was referred to in this item was not put in, but instead of that, in recompense, a bronze patch was fitted on."

Wilhelmson and Gray both deny the "recompense" agreement.

No. 8 was completed as specified.

As to No. 9 there is no dispute. The crank-shaft did not go to the shop, and certain other work was done not anticipated.

No. 10 was completed as specified, and No. 11 also.

"No. 12 was completed with the exception that the engine-room tank-tops were not covered with cement. She was cemented under the boilers only."

No. 13 Klitgaard says was completed as specified.

No. 14:

"The windlass was not repaired, after a consultation with Capt. Saunders and Mr. Wilhelmson; we found it was not necessary; and instead of that, as recompense, we put two channel iron supports under the break of the forecastle head."

This agreement is again denied by Wilhelmson and Gray.

No. 15 was completed.

There is some corroboration of Klitgaard's testimony respecting the supposed "compensation" agreements with respect to the exchange of work, by Capt. Saunders, Kinsman, and possibly one or two others. But upon a careful balancing of all the testimony upon the subject, we are fully satisfied that no such agreements were entered into or existed. It is unnecessary to attempt to analyze the testimony relating thereto. It is so voluminous that it is well-nigh impossible to do it were we so disposed. The parties were in accord that the changes, modifications, and additions should be made as the work progressed and the necessity or desirability therefor developed; but the agreements for exchange of one piece of work for another as claimed by respondent are not established by the weight of the evidence. After all, this conclusion but accords with respondent's statement in its answer, namely:

"That during the progress of said work it was mutually agreed that certain omissions, modifications, and changes in said specifications and the work to be performed under said contract should be made, and the same were made and omitted without an agreement between the parties as to the value of said omissions, changes, and modifications. That certain work and materials were also furnished to said steamer by said libelant during said period of time between August 23 and September 25, 1909, in addition to the work and materials called for by said contract, and for which no price was agreed upon other than that the same would be compensated for at its just and reasonable value."

It must be now fully apparent that the contract specifying a lump-sum as an upset price was so departed from that it is wholly and utterly impossible to apportion the contract price to the work which was done in pursuance of the contract and that which was done to take the place of and over and beyond the specifications. There can be no adjustment whatever on such a basis.

The respondent has wholly failed to sustain its contention, and it results that the libelant is entitled to recover.

Some questions have arisen respecting shop time and overtime charges. By reason of the demands of the laborers' union, the hours of service per day were reduced; but the same wages per day were required to be paid notwithstanding. This all transpired before the present controversy arose. But in getting the result of a man's time and consequently the wages due him, the hours were increased above those actually served and the rate per hour was lessened. The example given by counsel for libelant is very apt. A person working 8½ hours is credited with 10 hours' service at a rate of 65 cents per hour, resulting in a day's wage of $6.50, instead of being credited with 8½ hours' service at the rate of $.7644 plus per hour, which results in the same thing, or a day's wage of $6.50. The charge was the same in either event, and nobody has been hurt by the peculiarity of the bookkeeping. The overtime query is explained upon a like basis.

Beyond this, some miscellaneous irregularities are attempted to be pointed out; but, without following them in detail, it is sufficient to say that they do not affect the cause at its final outcome, and we conclude that libelant is entitled to recover the entire amount claimed by its first cause.

As to the second cause of libel, after a careful examination of the testimony, we readily concur with the findings of the trial court.

Objection is made to the allowance by the lower court of costs to libelant. This was a matter resting within the sound discretion of the trial court, and it is not apparent that there has been any abuse of that discretion.

So of the interest which libelant here claims on the unliquidated demand. We think the trial court properly disallowed the same.

The decree of the court below will be affirmed, with costs on appeal to the appellee.