GLOBE & RUTGERS INS. CO. OF CITY OF NEW YORK v. PRAIRIE OIL & GAS CO.

(Circuit Court of Appeals, Second Circuit. December 4, 1917.)

No. 28.

1. INSURANCE ⬡➡542(1)—FIRE POLICIES—PROOFS OF LOSS.

Substantial compliance with the requirement of a fire policy as to proofs of loss is sufficient, though failure to comply will defeat recovery.

2. INSURANCE ⬡➡542(2)—FIRE POLICIES—PROOFS OF LOSS—SUFFICIENCY.

Proofs of loss, setting forth the time and origin of the fire, that no other person or party had any interest in the property destroyed, or any incumbrance thereon, specifying the cash value of the items making up the loss, the amount of other insurance on the property, and, after stating that no act had been done by the insured in violation of the policy, stated that the insured would produce its books of account and make replies to interrogatories propounded by the insurer relating to the loss, were sufficient.

3. INSURANCE ⬡➡558(2)—FIRE INSURANCE—PROOFS OF LOSS—WAIVER.

Where the insurer's adjuster acknowledged receipt of the proofs of loss and returned them, stating as his reason that he had offered to replace the oil lost and his offer had been declined, any defects in the proofs of loss made under a fire policy were waived.

4. INSURANCE ⬡➡542(2)—FIRE POLICIES—PROOFS OF LOSS.

Where the insured gave elaborate proofs of loss of tanks and oil, the proofs cannot be deemed insufficient, and recovery denied, because the insured, in computing the transportation charges, which, it was admitted, had enhanced the value of the oil, did not compute the charges on the same basis as did the insurer.

5. INSURANCE ⬡➡560(3)—FIRE POLICIES—PROOFS OF LOSS—WAIVER.

Specification of a particular defect in proofs of loss furnished by the insured is a waiver of others.

6. INSURANCE ⬡➡558(1)—FIRE POLICIES—WAIVER OF FORFEITURES.

An offer by the insurer, after receiving proofs of loss, to replace the property destroyed, waives all known forfeitures, including defects in the proofs of loss.

7. INSURANCE ⬡➡595—FIRE POLICIES—AGREEMENT TO REPLACE PROPERTY.

Where a fire insurer exercises its option to replace the property destroyed, the contract of insurance from that time becomes converted into a new and independent undertaking on the part of the insurer to replace the property, restoring it to its former condition.

8. INSURANCE ⬡➡595—FIRE POLICIES—REPLACING OF PROPERTY.

Where a fire policy gave the insurer an option to replace the property lost or damaged with other property of like kind and quality within a reasonable time, and part of the property lost was petroleum oil, the insurer cannot defeat recovery under the policy on the ground its offer of replacement was rejected, where it did not offer to replace the oil with similar oil; petroleum oils varying greatly in their properties.

9. INSURANCE ⬡➡595—FIRE INSURANCE—REPLACING OF PROPERTY.

Where oil tanks and their contents, which were insured against fire, were burned, and the oil lost, the insurer, though given an option in the policy to rebuild the property, or replace the same with property of like kind and quality, cannot elect to replace the oil without replacing the tanks, on the theory that it could tender the oil and insured was bound to provide a place to store it, for that would cast an unconscionable burden on insured, and the insurer has no right to replace part of property destroyed and pay for the remainder.

⬡➡For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**10.** INSURANCE ⬥➾499—FIRE POLICIES—MEASURE OF DAMAGES—ACTUAL CASH VALUE.

Where a fire policy declared that the insurer should not be liable beyond the actual cash value of the property at the time of the loss, and that the loss or damage should not exceed what it would cost insured to repair or replace the same with material of like kind and quality, the actual cash value of petroleum oils covered by the policy, and which were lost through fire, is the market value of such oils.

**11.** TRIAL ⬥➾141—DIRECTION OF VERDICT.

Where an insurer was liable for the cash value of oil destroyed, and all of the evidence showed that the market value of such oil was 75 cents per barrel, and no evidence that it could be bought for a lesser price, it was proper to direct a verdict for the insured on the basis of that price.

**12.** INSURANCE ⬥➾668(13)—QUESTION FOR JURY.

Where petroleum oil, which had been piped for 400 or 500 miles from the field, and was practically pure, was destroyed while stored in a tank, and the insured showed that, on account of the sediment in the tank, it deducted a certain number of barrels, there is no question for the jury; there being no evidence to show that the deduction on account of the sediment or impurities in the oil was not sufficient.

**13.** INSURANCE ⬥➾668(13)—QUESTION FOR COURT—TRANSPORTATION OF OIL—PIPE LINES—RATES.

An oil company, which operated a pipe line and was required to charge the tariffs established by the Interstate Commerce Commission, stored oil, which it had piped for several hundred miles, at a point for which no tariff had been established. The oil was there destroyed by fire. In an action on the fire policy, the insurer contended, it being admitted that the transportation of the oil enhanced its value, that the question of the cost of piping the oil was for the jury. The oil company contended, however, that the piping charges should be ascertained by apportioning the rate established for carriage to a more distant point. *Held*, that the charges were properly ascertained in that manner, and hence there was no question for the jury as to the actual cost.

In Error to the District Court of the United States for the Southern District of New York.

Action by the Prairie Oil & Gas Company against the Globe & Rutgers Insurance Company of the City of New York. There was a judgment for plaintiff on a directed verdict, and defendant brings error. Affirmed.

The plaintiff is a corporation existing under the laws of the state of Kansas. The defendant is a corporation existing under the laws of the state of New York. The plaintiff sues on a policy of insurance issued to defendant on February 6, 1914, insuring against all direct loss or damage by fire, except as in the policy provided, to the amount of $6,477,000. The property insured consisted of iron tanks (used for storing petroleum) and their contents. While the policy was current, two fires occurred: (1) On September 2, 1914, destroying tanks numbered 8, 9, and 13, together with their contents, at Barney Farm, Drumwright, Okl.; and (2) on September 6, 1914, destroying tank numbered 1306, with its contents, at Shannondale, Mo. The two fires are made the subject of two separate causes of action in the same complaint.

The defendant's answer sets up a general denial as to each cause of action. As a separate and partial defense to the first cause of action it sets up the assured's refusal to permit the defendant to replace the property destroyed; and as a separate defense to the first and second causes of action the answer alleges that the plaintiff had wholly failed to serve on defendant a

⬥➾For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

statement, signed and sworn to by it, stating its knowledge and belief as to the time and origin of the fires, its interest, and that of all others in the property, the cash value of the various items making up the same, the incumbrances, if any, thereon, other insurance, if any thereon, and a copy of the description and schedules in all policies, as well as any changes in the title, use, occupation, location, possession, or exposure of the property from the time the policy was issued.

As to the first cause of action it is stipulated between the attorneys that the number of barrels of fluid destroyed in tanks 8, 9, and 13 at Barney Farm, Drumwright, Okl., by fire, on September 2, 1914, was as follows: Oklahoma crude fluid, 122,778.77 barrels, less fluid saved, 2,899.59 barrels; net amount of petroleum destroyed, for which the plaintiff in error admits liability as to quantity only, was 116,282.80 barrels; that the tanks themselves were each of 55,000 barrels capacity, and were worth at the time of the fire in the aggregate $38,250 ($12,750 each), and were totally destroyed by said fire, and that the amount of the liability of the plaintiff in error is the sum of $15,000 ($5,000 each). The occurrence of the fire of September 2, 1914, the ownership of the property on that day by the assured, and that the fire was not caused by any of the causes excepted in the policy were also admitted.

As to the second cause of action it is also stipulated that the number of barrels of fluid destroyed in tank No. 1306 at Shannondale, Mo., by fire on September 6, 1914, was as follows:

"Contents of tank No. 1306:

| | | |
|---|---|---|
| Oklahoma crude fluid | 52,025.77 | bbls. |
| Less sediment | 1,085.51 | " |
| | 50,940.26 | " |
| Less oil saved | 7,882.00 | " |
| Net amount of fluid destroyed | 43,058.26 | " |

"In connection with the above figure, 43,058.26, representing total amount of fluid destroyed, in barrels, it will be on the trial of this action the contention by the defendant (insurance company) that there should be deducted therefrom 1,291.75 barrels which will be claimed by the defendant (insurance company) represents sand and water in the fluid destroyed, and which contention the defendant (insurance company) reserves the right to endeavor to prove at the time of the trial of this action."

The stipulation admits that tank 1306 was the property of the assured, and was totally destroyed by fire on September 6, 1914; that the value of the said tank at the time of the fire was $12,750, and that the plaintiff in error is liable in the amount of $5,000; the occurrence of the fire of September 6, 1914; the ownership of the property on that day by the assured; and that the fire was not caused by any of the excepted causes in the policy.

At the close of the trial counsel for defendant, moved to dismiss, and the motion was denied. Counsel for plaintiff moved for a direction of a verdict for the plaintiff on each cause of action, and this was granted, and judgment entered for $8,451.19.

Leo Levy, of New York City (Alex. Davis, of Brooklyn, N. Y., of counsel), for plaintiff in error.

Bruce Ellison and Andrew A. Fraser, both of New York City (William B. Ellison, of New York City, of counsel), for defendant in error.

Before WARD and ROGERS, Circuit Judges, and LEARNED HAND, District Judge.

ROGERS, Circuit Judge (after stating the facts as above). [1] This is an action upon a policy of insurance, and the defendant claims

that the action cannot be maintained because the proofs of loss were insufficient. The object of the clause concerning proofs of loss inserted in a policy is to give the company proper information as to the facts rendering it liable. Failure reasonably to comply with such a clause, if not waived by the company, defeats recovery. A substantial compliance is, however, all that is required. Glazer v. Home Ins. Co., 190 N. Y. 6, 82 N. E. 727; Davis v. Grand Rapids Ins. Co., 157 N. Y. 685, 51 N. E. 1090; De Raiche v. Liverpool, etc., Ins. Co., 83 Minn. 398, 86 N. W. 425.

[2] The court below held the proofs of loss in the case at bar sufficient, and this court is of like opinion. The proofs set forth the time and origin of the fires; that no other person or party had any interest in the property destroyed or any incumbrance thereon; the cash value of the various items making up the loss is set out in detail aggregating $125,396.86; the amount of other insurance and in what companies it was placed is specifically stated; a copy of the descriptions and schedules in all the policies is annexed; and the fact is set forth that no act had been done or caused to be done by the assured in violation of the policy which would become void. The proofs also stated that the insured would produce its books of account and other proper vouchers and make replies to interrogatories propounded by authority of the company relating to the loss. This surely was all that the law required. The objections raised are technical, and were properly disregarded. The statement of loss showed that the total value of the oil in all the plaintiff's tanks at the time of the fire did not exceed $38,080,000. At the same time the number of barrels of oil at the time in each tank that was destroyed is set forth and the value is stated, as well as the amount of the loss.

[3] Moreover, in a letter dated February 24, 1915, the adjuster acknowledged receipt of proof of loss and returned the same, stating as his reason for so doing that he had offered to replace the oil, and his offer had been declined. As it raised no objection to the proofs, it was therefore a waiver of any defects. Tayloe v. Merchants' Fire Ins. Co., 9 How. 390, 403, 13 L. Ed. 187.

[4-6] As to the proof of loss in the second cause of action—the Shannondale loss—the objection made was in the omission to deduct the sand and water salvage and in the statement of the transportation charges at 34 cents, instead of 13 cents. These differences represented a dispute between the parties, and the insured was, of course, not bound to make the proof of claim according to the insurer's view upon that issue. As to all other defects, if any, they were waived by the specific mention of these as the only ones. Thompson v. Liverpool, etc., Co., Fed. Cas. No. 13,966; McManus v. Western Assur. Co., 43 App. Div. 550, 558, 48 N. Y. Supp. 820, 60 N. Y. Supp. 1143. But, even if there were merit in the claim that the proofs of loss were insufficient, which there is not, defendant would not be entitled to raise it on its own showing. It is striving to maintain two propositions, one of which destroys the other. It insists that the plaintiff is not entitled to recover because its proofs of loss are insufficient, and it at the same time insists that plaintiff is not entitled to recover, because it (the de-

fendant) offered to replace the property destroyed and its offer was rejected. It overlooks the fact that, if an offer to replace was made, it was made after the proofs of loss were received, and that the law is that such an offer waives all known forfeitures. Bersche v. Globe Ins. Co., 31 Mo. 546.

[7, 8] The defendant also relies upon the following provision contained in the policy:

"This company shall not be liable beyond the actual cash value of the property at the time any loss or damage occurs, and the loss or damage shall be ascertained or estimated according to such actual cash value, with proper deduction for depreciation, however caused, and shall in no event exceed what it would then cost the insured to repair or replace the same with material of like kind and quality. Said ascertainment or estimate shall be made by the insured and this company, or, if they differ, then by appraisers, as hereinafter provided; and, the amount of loss or damage having been thus determined, the sum for which this company is liable pursuant to this policy shall be payable 60 days after due notice, ascertainment, estimate, and satisfactory proof of the loss have been received by this company in accordance with the terms of this policy. It shall be optional, however, with this company to take all, or any part, of the articles at such ascertained or appraised value, and also to repair, rebuild, or replace the property lost or damaged with other like kind and quality within a reasonable time, on giving notice, within 30 days after the receipt of the proof herein required, of its intention so to do; but there can be no abandonment to this company of the property described."

The defendant insists that it exercised the option to replace, to which it was entitled, and that the plaintiff refused its offer. Where an insurance company has elected to replace, the law is that from that time the contract of insurance becomes converted into a new and independent undertaking on the part of the insurers to replace the property, restoring it to its former condition. Richards on Insurance (3d Ed.) § 244.

It is urged that the court below was in error in not submitting to the jury the question whether or not there was an offer made by the defendant to replace. But no error was committed in this respect, if the facts relied upon as constituting the offer did not in law amount to one which the plaintiff was bound to accept. The offer defendant claims it made was an offer to replace the oil involved in the first cause of action. No claim is made of any offer to replace the oil involved in the second cause of action. It may be conceded that, if an offer was made as to the oil involved in the first cause of action, and plaintiff without legal excuse refused to allow the defendant to replace it, the first cause of action fails. We fail, however, to find any evidence in the record of an offer which could be regarded as sufficient in law.

The defendant's answer sets up that, within 30 days after its receipt of proof of loss, it notified the plaintiff that it desired and was ready to replace the property "with other property of like kind and quality," and that it offered so to do, both orally and in writing. There is, however, no evidence in the record that the offer to replace was an offer to replace with oil of "like kind and quality" to that which was destroyed. Petroleum oils vary greatly in their properties, and the lan-

guage of the policy made it incumbent on the defendant to replace in kind and quality in case it replaced at all.

[9] The policy insured, not simply the oil, but also the tanks in which the oil was contained, and the offer was to replace the oil, and it did not propose to replace the tanks. It is difficult to see how the oil could be replaced without at the same time replacing the tanks to receive it. The insurer was informed, when its agent proposed that the oil be replaced, that there were no tanks which could receive it, and he replied that he would advise his clients that they had a right to tender the oil, and, if the plaintiff did not provide a place to put it, "they [the insurance company] could pour it on the ground." The law gave it no such right. If the company proposed to replace the oil, it was bound also to replace the tanks, having insured both. The option to replace is an option to replace the whole loss. It is not permissible to replace in part and pay in part. May on Insurance (4th Ed.) p. 1005, § 430. If the policy had covered only the oil, it might have been necessary to hold that the insured took the chance of having at hand suitable tanks or some other containers in which to receive the oil, but not so when the policy covered the tanks as well as the oil. It would be only a burden to offer the oil when there were no tanks in which to receive it. It would be quite as unreasonable as to replace some, but not all, parts of a machine. The contract in all such cases is one to restore the position of the insured, and under the option the restoration must be by specific performance. Any specific performance must be complete, or it is not restoration. It surely cannot be the law, if a company insures a house and its contents, and both are totally destroyed, that, if the company has an option to replace, it could exercise it by replacing goods and chattels of like quantity and quality on the ground unprotected, while it paid in cash the value of the house. If there are adjudicated cases supporting any such proposition, they are unknown to us. The property destroyed is to be restored to its former condition, and it must be as serviceable and valuable as before the fire. Commercial Fire Ins. Co. v. Allen, 80 Ala. 571, 1 South. 202.

[10, 11] This brings us to inquire whether the value of the oil destroyed was sufficiently established to sustain the direction of the verdict. The policy provided that:

"This company shall not be liable beyond the actual cash value of the property at the time any loss or damage occurs and the loss or damage shall be ascertained or estimated according to such actual cash value, with proper deduction for depreciation, however caused, and shall in no event exceed what it would then cost the insured to repair or replace the same with material of like kind and quality."

The actual cash value of the oil at the time of the fire was to be the measure of damages, but it could not exceed what it would cost the insured to replace it. The cash value of an article is the amount of cash for which it will exchange in fact. Ankeny v. Blakley, 44 Or. 78, 74 Pac. 485; National Bank of Commerce v. City of New Bedford, 155 Mass. 313, 29 N. E. 532. And cash value is the market value for which an article will sell for in cash on the market. Missouri, K. & T. Ry. Co. of Texas v. Murray (Tex. Civ. App.) 150 S. W. 217, 218;

Frick v. United Firemen's Ins. Co., 218 Pa. 409, 67 Atl. 743. We think the evidence clearly shows that at the time of the Oklahoma fire the cash value of oil in that state was 75 cents a barrel. At that time the state of Oklahoma had a state Corporation Commission which fixed the price of oil and no one had a legal right to sell oil in that state for less than the price so established. A member of the commission testified that the price of oil at the time of the fire was 75 cents a barrel. There were other witnesses who gave similar testimony. No witnesses were produced who testified that oil could have been purchased in Oklahoma for less than 75 cents a barrel at the time when this loss occurred. The oil destroyed came from the plaintiff's own wells, and it had no right to sell for less then the established price, the market price, which was 75 cents a barrel. This seems sufficient to establish what the cash value of the oil was, and, as there was no evidence to contradict it, there was no question for the jury.

As respects the oil destroyed at Shannondale, Mo., and which is involved in the second cause of action, the evidence is that it had the same value as the oil in the Oklahoma or Custing field. We do not find in the record contradictory evidence upon that point.

[12] The plaintiff in its proof of loss in connection with the Shannondale fire stated the contents of the tank there destroyed as 52,285.-77 barrels of oil, less 1,058.51 barrels deducted for sediment (sand and water), and less 7,882 barrels saved, making a total loss of 43,058.26 barrels of oil destroyed. The defendant, however, claims that it is entitled to a 3 per cent. deduction for sediment, and the deduction made by the plaintiff in its proof of loss was actually much less than that to which it was entitled on a 3 per cent. basis. The reason why the allowance actually made for the sediment was not on the 3 per cent. basis, as explained by the plaintiff's witness, appears to have been that the sediment for which it is customary to deduct is for sediment accumulated in the various tanks through which the oil passed at a considerable distance before it reached Shannondale, and that when it reached the Shannondale tank it arrived 100 per cent. pure having passed over a distance of from 400 to 500 miles by which time the sediment had been pretty well precipitated, so that there remained only about a quarter of 1 per cent. of sediment, or practically a negligible quantity. The testimony, however, shows that there was a certain amount of sediment in the Shannondale tank which had been accumulating since the tank was built, and that the company had allowed for it in its proof of loss. The 3 per cent. deduction was actually made at the wells, and in addition an actual deduction of 1,085.51 barrels was made for sediment in the tank. We think that this left no question for the jury, as there was no contradictory testimony going to show that the allowance had not been made for sediment, or that the amount allowed was not sufficient.

[13] This brings us, in conclusion, to the defendant's claim, urged upon the argument, that there was a question for the jury respecting the gathering, pipage, and transportation charges. The defendant claims that the plaintiff is only entitled to what it cost it to pipe the oil and gather it, as it did its own gathering and piping, bringing its

own oil in its own pipes from its wells in Bartlesville, Okl., to Shannondale, in Missouri.

The plaintiff claims that it is entitled to recover these gathering and pipage charges, which charges enhanced the value of the oil. The prices charged for these services were on the basis of a tariff approved by the Interstate Commerce Commission, and were mandatory. The tariff as published regulated the charges from Bartlesville to Wood River, Ill. There was no published tariff to Shannondale. The amount charged to Bartlesville was therefore proportioned in accordance with the through rate to Wood River. It was conceded by defendant's counsel at the trial that the plaintiff was entitled to recover the cost of carriage to the tanks. This he did in reply to a statement made by the trial judge that:

"The cash value would be the cost of production plus the cost of carriage. I think he would be entitled to show the cost of carriage to their tanks."

To which defendant's counsel answered:

"If there were a tariff to Shannondale, yes; but he is not entitled to fix the apportionment between the points."

To which the court replied:

"That is the only way he has to fix it."

The testimony disclosed that plaintiff had no way of determining what it actually cost it to pipe the oil, and it charged on the basis of the rate fixed by the Interstate Commerce Commission; its officer testifying that it could not carry for less than that and that they could not charge more. It being admitted by counsel at the trial that, if there had been a published tariff to Shannondale fixing the carriage charge, the rate so fixed could be accepted, we think that the court was justified, under the circumstances, in permitting the evidence to go in that the charge made was proportioned on the basis of the rate as fixed to Wood River.

Judgment affirmed.