## MASSACHUSETTS BONDING & INS. CO. v. NORWICH PHARMACAL CO.

Circuit Court of Appeals, Second Circuit.
April 4, 1927.

No. 249.

**1. Insurance ⬅539(1)—Embezzlement policy, requiring loss to be discovered within 36 months of expiration of suretyship, held not to require diligence to "discover" loss.**

Under insurance policy against loss through employés' theft or embezzlement, providing that loss shall be discovered during continuation of suretyship, or within 36 months thereafter, and notice thereof delivered within 10 days, insured *held* not precluded from recovering on policy because it failed to use reasonable diligence to discover employé's defalcations; "discovery," however defined, *not* including mere possibility of informing one's self.

**2. Insurance ⬅542(6)—Claim stating total embezzlements for each month held sufficient, where time and amount of each could not be ascertained.**

Under insurance policy against loss through employés' theft or embezzlement, insured's written claim for loss, not stating each theft separately as to amount, but merely stating total losses for each month, *held* sufficient in form, where it was impossible to ascertain amount and time of each peculation.

**3. Evidence ⬅376(6)—Contemporaneous account entries are admissible, without supplemental testimony of entrants, if they would not recollect entries, or if burden of producing them unduly heavy.**

In action at law involving voluminous contemporaneous records, account entries may be admitted in evidence without supplemental testimony of entrants, if trial judge is satisfied that added credence by testimony of entrants does not justify expense and difficulty of getting them to trial, that document was prepared under routine warranting its reliability, that missing entrants, if called, would have no recollection of events recorded, and could merely corroborate existing testimony as to course of business, or that, either because of their number, distance from place of trial, difficulty of finding them, or other reasons, burden of producing them would be unreasonably heavy on proponent.

**4. Evidence ⬅376(6)—Tabulation of postage used, to show employé's embezzlements by making charges against parcel post account, held admissible, without supplemental testimony of entrants.**

In action on employés' theft and embezzlement insurance policy for employé's embezzle-

---

ment of sums charged to parcel post account, tabulation of amounts of postage actually used, made from notations on 32,000 orders, total of which was deducted from total charged against account, leaving difference which insured claimed represented amount embezzled, *held* admissible in evidence, without producing entrants who, though only two or three in number, were over 1,500 miles from place of trial, even if insured did not show that two of them were not still in its employ.

**5. Trial ☞84(3)—Objection to admissibility of records because entrants were not called did not raise objection that their absence was not satisfactorily explained.**

Objection that tabulation purporting to show amounts embezzled by employé was inadmissible, because persons who made entries were not called, raised only the question whether their presence was necessary, and not that their absence was not satisfactorily explained.

**6. Courts ☞348—State rules of evidence as to admission of account entries are not authoritatively binding on federal courts (Comp. St. § 1537).**

Under Rev. St. § 914 (Comp. St. § 1537), state rules as to admissibility in evidence of account entries are not authoritatively binding on federal court in action at law, when to follow state rules would not be for administration of justice; Rev. St. § 721 (Comp. St. § 1538), not being applicable.

In Error to the District Court of the United States for the Northern District of New York.

Action by the Norwich Pharmacal Company against the Massachusetts Bonding & Insurance Company. Judgment for plaintiff, and defendant brings error. Affirmed.

Writ of error to a judgment of the District Court for the Northern District of New York in favor of the plaintiff upon the verdict of a jury.

The action was upon an insurance policy guaranteeing the plaintiff against loss through theft or embezzlement of its employees. The loss in suit was of funds embezzled by one Kenyon, an employee of the plaintiff, during the period when the policy was in force, between January, 1921, and April 30, 1922. The facts proved were as follows: Kenyon was the manager of the Kansas City branch of the plaintiff's business, and was constantly on the road. For local expenses the plaintiff maintained a bank account at Kansas City on which Kenyon could draw, the cheques being countersigned by another employee, Eva Kerr. Kerr testified that it was her habit to draw on this account, and give the money to Kenyon for his traveling expenses, who on his return would give her his itemized accounts of what he had paid out while away. During the period in question, with more or less

regularity, Kenyon rendered accounts to her, which did not exhaust the moneys he had received, and told her to charge the deficiencies to the parcels post account, which she did.

This the plaintiff relied upon to establish the fact that there had been some embezzlement for which the defendant was liable. To prove the amount it proceeded as follows: Although Kerr had no record of the moneys she had given Kenyon for his expenses, she did have an account of all moneys charged to the parcels post account. These, she swore, were made up in part of the sums which at Kenyon's direction she charged against it to cover his defalcations, and for the rest, of moneys which in cash or cheques she had given to the clerk of the shipping department, who bought the stamps. It became necessary, however, in order to show the deficiency, which was the supposed amount of Kenyon's thefts, to show how much of these sums was actually spent for stamps, because it was impossible to disentangle from the face of the stamp account itself the items with which Kerr had padded it. As this, which may be considered as the credit side of the account, was the principal issue litigated upon the trial, it is necessary somewhat at large to state the method of doing business at Kansas City.

Kerr had no control over the stamps, and knew nothing of the disposition of the moneys which she gave to the clerk. It was the practice of the shipping department to keep the stamps there, and use them in posting articles sold and sent out to customers. An order received from a customer was first approved by the credit department, and then sent to the head of the bookkeeping department, where it was recorded and given a folio number. Thereupon it went to the shipping department, where, if it was to be shipped by parcels post, the amount of the postage used was noted upon the back of the order by the two clerks who did the mailing. Thereupon the order was sent to the billing clerk, who added to it the price of the article, posted it in the ledger, and sent it back to the shipping department to be checked. Eventually the order reached the filing department where it was permanently kept for reference.

Kerr had gone over these orders on file for the period involved, some thirty-two thousand in all, and from the notations on the back of each computed the whole amount of postage so appearing. This she assumed to be the gross amount of stamps actually used, and this she subtracted from the total sums charged by her against parcels post. The result was tabulated in detail in a large

exhibit which showed a deficiency of over seven thousand dollars, the amount of the plaintiff's claim.

Kerr swore that she had often had occasion to go to the files to prepare a statement of old accounts which she sent to the main office for collection. In every case she found the necessary orders. Before the trial an expert employed by the defendant was given access to the plaintiff's files and books and to the tabulation. He testified that if the orders themselves were correct and complete, the tabulation was accurate. The orders were presented in court, available to the defendant, but were not offered in evidence. The shipping clerk in charge of the stamps had left the plaintiff's employ, but it did not appear where he was nor did the plaintiff show that he was inaccessible. There was also no evidence of the whereabouts of the other two men in the shipping department who used the stamps upon the parcels and made the notations. The defendant objected that the exhibit was incompetent because of the absence of these witnesses to complement the testimony of Kerr. The judge admitted the tabulation and the jury found a verdict for the deficiency therein shown.

The policy required the insured to give notice to the defendant of any loss covered by its terms within ten days after its discovery, and within three months to deliver a written claim showing the items and dates of its loss. In April of 1924, the plaintiff received an anonymous letter saying that there had been misdoing in its Kansas City branch. This it ignored, but upon receipt of a second letter it began an investigation which first disclosed Kenyon's thefts during the year 1923. On June twenty-fifth, it advised the defendant that it appeared as though Kenyon had profited by "certain irregularities in the records," though it could not yet tell whether these extended to the years 1921 and 1922. On July twenty-second, having satisfied itself that this was the case, it so advised the defendant and followed this notice by its claim in August. The claim did not pretend to state each theft either in amount or in time. It merely separated the months during the period in question, for each giving the amount of the reported use of stamps, the amount actually used, and the difference, which it called "inflation." This claim the defendant retained without comment.

Kenyon took the stand for the defendant. He swore that he had not embezzled any of the money drawn, and that there had been large quantities of advertisements sent out by parcels post without any orders whatever, which the files would not therefore show. In the last he was corroborated by another former employee in the shipping department, one Fisher. Kerr contradicted this; she said that no advertisements were sent out without orders to the shipping department, and that as a consequence the files showed all the postage used. She further gave as an estimate, independently of the tabulation, that Kenyon's weekly thefts had been on the average one hundred dollars.

The District Judge directed the jury that the plaintiff had given due notice of the loss, but left it to them to say whether Kenyon had in fact embezzled any of the plaintiff's funds, and, if so, how much. The jury having found for the plaintiff, as above stated, in the amount of the tabulation, the judge reduced the verdict to six thousand six hundred dollars, based upon Kerr's estimate of the average weekly theft of one hundred dollars, and the plaintiff consented to the remittitur.

Gannon, Spencer, Michell & Reiley and Charles E. Spencer, all of Syracuse, N. Y., for plaintiff in error.

Gilbert & Gilbert, of New York City (Abraham S. Gilbert, of New York City, of counsel), for defendant in error.

Before MANTON, HAND, and SWAN, Circuit Judges.

HAND, Circuit Judge (after stating the facts as above). [1] The defendant's first point is that the plaintiff could with reasonable diligence have discovered the defalcations of Kenyon earlier than it did, and that for this reason it had not fulfilled the condition of the policy requiring it to give notice within ten days after discovery. It argues that all the documents which it eventually used to make up the tabulation and prove the loss, were in its possession for more than two years before June, 1924, and it was always under a duty to watch its employees. Further that, if it failed in exercising such diligence, the time for notice ran from that at which it should have discovered the thefts. Finally, that the District Judge was therefore wrong in deciding that question himself; he should have let the jury say whether the plaintiff should not have discovered at some earlier time all that it discovered in the end.

The language of the policy, if nothing more, is an answer. It reads, "Loss shall be discovered during the continuation of this suretyship, or within thirty-six months thereafter; and notice thereof shall be delivered

* * * within ten days." The parties by this themselves agreed upon a period within which the insured was obliged at his peril to discover the loss. Discovery was contrasted with the duty to make it, and it would pervert the meaning of the agreement to require more. It was only on actually learning of the thefts that the duty to give notice arose. "Discovery" may not indeed be an exact word; we need not try here to define it. It is enough that nobody can give it a content which includes the mere possibility of informing one's self from the materials at the plaintiff's disposal.

[2] The form of the claim when rendered is also challenged; it is said to have no "items and dates of the losses," as required in the policy. There is no force in this objection either. Ignoring the fact that the defendant retained the claim without objection, it conformed with the condition in any event. Globe & Rutgers Ins. Co. v. Prairie Oil & Gas Co., 248 F. 452 (C. C. A. 2). The objection presupposes that each several peculation must be separately given both in time and in amount. Perhaps so, when these were ascertainable, but here that was impossible, and to require it would destroy the protection of the policy. It seems unnecessary to discuss so unreasonable a pretension; if the words could be twisted so far, the result would be a fraud upon the plaintiff.

The difficult question in the case, and the only other one which seems to us worth notice, is of the competency of the tabulation offered by the plaintiff. Error in its admission was not cured by the remittitur. Assuming that the vague testimony of Kerr that Kenyon stole on the average, one hundred dollars a week, would have been enough to support the verdict, the admission of the exhibit was a grave error, if it was not competent. Indeed, we are not left in this to inference, because the verdict shows that the jury accepted it to the dollar. We have no warrant for supposing that without it they would have thought Kerr's testimony enough on which to fix the amount of the thefts. Therefore, if the judgment is to stand we must say that the document was competent.

In the end the only parts which did not depend upon Kerr's own knowledge were the notations put upon the back of the orders, and the fact that the orders on file were complete records of all the stamps that were used in the shipping department. These furnished the credit items of the account; the charges were made by Kerr from moneys which she dispensed to the shipping clerk who bought the stamps, and from the entries with which in collusion with Kenyon she padded the stamp account, both of which were within her own knowledge.

[3] The situation is the familiar one of voluminous records, made at the time in the daily routine of a large mercantile business, by entrants not produced. The question is in what cases it is necessary to supplement proof of the way in which the business is carried on and the entries are made, by the testimony of the entrants themselves. It is a matter in which the sluggishness of the law is especially disastrous, and where the intervention of the Legislature, which must be by general rules, cannot be as satisfactory as a step by step progress of the courts, if they are willing to progress at all. The routine of modern affairs, mercantile, financial and industrial, is conducted with so extreme a division of labor that the transactions cannot be proved at first hand without the concurrence of persons, each of whom can contribute no more than a slight part, and that part not dependent on his memory of the event. Records, and records alone, are their adequate repository, and are in practice accepted as accurate upon the faith of the routine itself, and of the self-consistency of their contents. Unless they can be used in court without the task of calling those who at all stages had a part in the transactions recorded, nobody need ever pay a debt, if only his creditor does a large enough business. That there should not be checks and assurances of veracity we do not suggest; it is indeed possible to expose adversaries to genuine danger, but to continue a system of rules, originally designed to relieve small shopkeepers from their incompetence as witnesses, into present day transactions is to cook the egg by burning down the house.

We have already dealt with the matter at length in The Spica (C. C. A.) 289 F. 436, and less in detail in Straus v. Victor Talking Machine Co. (C. C. A.) 297 F. 791, 802, 804. In the Spica, we said following Mr. Wigmore, §§ 1521, 1530, that the question was one of discretion for the trial judge, and the "mere inability by reasonable effort to find the man or men who could speak with personal knowledge" might be enough to excuse the failure to produce them. That was a case in the admiralty, a circumstance to which we referred, but we can see no reason why there should be any difference in an action at law, and we acted on that assumption in Straus v. Victor Talking Machine Co. The question, as we view it, like many other questions as to the competence of evidence,

·is of degree, and·is not susceptible of absolute regulation. The judge must be satisfied from the whole situation that the added credence to the document which the testimony of the entrants will bring does not ·justify the expense and difficulty of getting them to the trial. It ought to appear that the document was itself prepared under a routine which warrants its reliability; that the missing entrants, if called, would in the nature of things have no recollection of the events recorded and could do no more than corroborate the existing testimony as to the course of business in which they had a part; that either because of their number, their distance from the place of trial, the difficulty of finding them, or for other reasons, the burden of producing them would be unreasonably heavy upon the proponent. These considerations are not exhaustive, rather they illustrate the nature of the question, and the proper approach to its solution.

In five circuits the older rule has been much relaxed. It would serve no purpose to state the extent of the change in each decision; it is enough to say that the judges, largely under the influence of Mr. Wigmore, 'the recognized master of the whole subject, have slowly adapted their rulings more nearly to current methods accepted as reliable. Reyburn v. Queen City Savings Bank & Trust Co., 171 F. 609 (C. C. A. 3); Rutan v. Johnson & Johnson, 231 F. 369 (C. C. A. 3); Du Pont v. Tomlinson, 296 F. 634 (C. C. A. 4); Templar Motors Co. v. Bay State Pump Co., 289 F. 24 (C. C. A. 6); Wisconsin Steel Co. v. Maryland Steel Co., 203 F. 403 (C. C. A. 7); Mississippi River Logging Co. v. Robson, 69 F. 773 (C. C. A. 8). In the Ninth Circuit, Matson Nav. Co. v. United Eng. Works, 213 F. 293, the proponent of the document had made first hand proof throughout, so that it was not necessary to invoke the more liberal doctrine. Consolidated Gas Co. v. Newton, 258 U. S. 165, 42 S. Ct. 264, 66 L. Ed. 538, while somewhat remote .from the facts at bar, is an example of a ·similar disposition.

.[4] In the·case at bar we think the facts justified the judge in admitting the tabulation. The transactions recorded were already more .than four years old, and the entrants, though only two or three in number, had then been ,some fifteen hundred miles away from the place of trial. The probability that if called. they could have added anything to the credibility of the original entries was nil. It is quite. true that the plaintiff did not show that two of them were not still in its employ; perhaps he could have brought them on and

produced them, but the 'difficulty and expense of doing so was in our judgment entirely out of proportion to the value of their testimony. Nor was it necessary to call the shipping clerk to prove that he had not stolen the moneys given him to buy stamps; the plaintiff might rely upon the presumption that he discharged his duties. Neither he nor the other clerks were needed to prove that no advertisements were sent out without orders, for Kerr swore categorically to that, and. she was in a position to know. On the strictest theory their testimony was necessary only to fill in the link that the notations represented postage actually used. As to these we think that they might have been dispensed with.

[5] Moreover, the defendant never expressly raised the only point which, as we view the law, was open to it. It did object to the admission of the tabulation on the ground that the entrants had not been called, as well as the clerk who bought the stamps. This raised only the question whether their presence was necessary; it did not suggest that their absence was not satisfactorily explained. If a party wishes to exclude such proof, we think it fair to insist that he raise the objection in· such form that the proponent may supply the missing evidence. We cannot say that, had the point been taken, the plaintiff would not have been able to show that all the clerks were unavailable. The objection as made absolutely required their production, and the defendant invoked, and meant to invoke, only the rule which we do not recognize.

Therefore, unless we are authoritatively bound by the state law, we should not hesitate to accept the tabulation. It is argued that we are, and that by the decisions of the highest court of New York it was necessary to call the missing clerks. Mayor, etc., v. Second Avenue R. R., 102 N. Y. 572, 7 N. E. 905, 55 Am. Rep. 839. It is quite true that that case is the last in which the Court of Appeals of New York has spoken, but it was decided forty years ago, was itself a liberalization of the existing rule, and, whatever it implied, at least did not expressly lay down anything to the contrary of what we have said. Moreover, in a very recent decision (Litchfield Construction Co. v. City of New York, 244 N. Y. 251, 155 N. E. 116), the same court, while not finding it necessary under the facts then at bar to go beyond that ruling, gave a distinct intimation, at least in their apparent approval of our ruling in The Spica, that they were not indisposed. to extend the exception further. We have no reason to suppose that, if the point were presented as

it is here, that court would differ from us in result. Until so advised, we feel free to adopt our own views.

[6] Moreover, while we should on this as on other matters, defer to a court whose deserved authority and distinguished learning we so much respect, we do not accede to the proposition that because this is an action at common law, the state rules of evidence were authoritatively binding upon the District Court. The Supreme Court did indeed in Nashua Savings Bank v. Anglo-American Co., 189 U. S. 221, 23 S. Ct. 517, 47 L. Ed. 782, say as much, but the language was not necessary to the result, and all or nearly all the other cases in that court in which the point was involved, concerned a local statute, which is of course controlling. It must also be admitted that a majority of the circuits have at least declared, if they have not held, that we are so bound, Pooler v. U. S., 127 F. 519 (C. C. A. 1); American, etc., Co. v. Hogan, 213 F. 416 (C. C. A. 1); Western Union Tel. Co. v. Ammann, 296 F. 453 (C. C. A. 3); Du Pont v. White, 8 F. (2d) 5 (C. C. A. 3); Franklin Sugar Ref'g Co. v. Luray Supply Co., 6 F.(2d) 218 (C. C. A. 4); Myers v. Moore-Kile Co., 279 F. 233 (C. C. A. 5); Stewart v. Morris, 89 F. 290 (C. C. A. 7). But in the Sixth and Eighth Circuits the opposite view prevails. Hocking Valley R. R. Co. v. N. Y. Coal Co., 217 F. 727 (C. C. A. 6); West Tennessee Grain Co. v. Shaffer, 299 F. 197 (C. C. A. 6); Union Pac. Ry. v. Yates, 79 F. 584, 40 L. R. A. 553 (C. C. A. 8); Chicago & N. W. Ry. Co. v. Kendall, 167 F. 62, 16 Ann. Cas. 560 (C. C. A. 8). Judge Amidon's characteristically careful and satisfactory opinion in the case last cited seems to us to demonstrate that the situation is with section 914 (Rev. St. [Comp. St. § 1537]) and not section 721 of the Revised Statutes (Comp. St. § 1538). If so, it is well settled that the District Court is not rigidly bound by the common-law procedure of the state, when to follow it would not be "convenient for the administration of justice" (Shepard v. Adams, 168 U. S. 625, 18 S. Ct. 214, 42 L. Ed. 602), but on the contrary would "unwisely incumber the administration of the law" (Indianapolis R. R. Co. v. Horst, 93 U. S. 291, 23 L. Ed. 898). We should therefore feel free, if the occasion demanded, to adopt the common law as we understood it, even though we were at variance with that recognized by the courts of the state in which the cause was tried.

The other points raised require no discussion.

Judgment affirmed.