## THE SPICA.

## MORSE DRY DOCK & REPAIR CO. v. SUSQUEHANNA S. S. CO.

(Circuit Court of Appeals, Second Circuit. March 14, 1923.)

No. 222.

I. **Admiralty ⬅85—Report of commissioner as to facts merely advisory.**

The report of a commissioner, to whom is referred the ascertainment of facts, is merely advisory; the power of final decision being in the tribunal to whom the report is made.

2. **Admiralty ⬅83—Power of court and rights of parties as to reference stated.**

There is no right in admiralty to a reference, but the court is empowered to try each and every part of every case, and it is not competent for the court, without the consent of the parties, to refer the entire decision of a case to a master or commissioner, as in equity the court cannot, either of it own motion or on request of one party, abdicate its duty to adjudge the controversy presented.

3. **Admiralty ⬅117—Trial de novo does not preclude appellate court from using findings of lower court.**

While a decree of the District Court in admiralty is vacated by an appeal, and a trial de novo required in the appellate court, this does not preclude the appellate court from making such use of the findings and proceedings below as makes for celerity and brevity.

4. **Maritime liens ⬅65—Evidence held not to show contract for definite price.**

Evidence *held* to warrant a finding that libelant, suing for unpaid labor and material furnished in converting the libeled vessel into an auxiliary, did not contract to do the work for a definite stated sum.

5. **Account stated ⬅19(3)—Evidence of contract on cost plus basis not warranting recovery as for account stated.**

Evidence that libelant contracted to change the libeled vessel to an auxiliary on a cost plus percentage basis *held* not to warrant a recovery by libelant on the presentation of bills for such labor and material as for an account stated.

6. **Maritime liens ⬅65—Failure of auxiliary engine to function held, under evidence, no defense to libel for work on installation.**

Evidence that the installation of an auxiliary engine furnished by the owner's agent and installed by libelant on a cost plus percentage contract basis failed to function as expected *held* not sufficient to warrant a finding that libelant did the work of installation so badly, or so injured the vessel, as to constitute a good defense or counterclaim to libelant's action.

7. **Admiralty ⬅60—Common-law forms of pleading inapplicable.**

The rule of pleading in admiralty is single and simple, and under Admiralty Rule 22 (267 Fed. xii), the sole requirement is that the libel shall propound and allege in distinct articles the various allegations of fact on which the libelant relies; the common-law forms of pleading having no application.

8. **Maritime liens ⬅65—"Proof" of cost of material and labor items under cost plus contract held insufficient.**

In libel by contractor for labor and material in converting a vessel into an auxiliary under a contract on a cost plus percentage basis, proofs of the material and labor items by testimony of libelant's accountant, and identification of bills rendered, compiled from charge sheets prepared by the cost department of libelant, together with testimony as to libelant's scheme and system of cost accounting, *held* insufficient to prove the cost of the labor and material furnished, as the term "proof" means the satisfying of fair men by fair means of what was done, having

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

regard to lapse of time, kind of work, and multiplicity of necessary agencies.

[Ed. Note.]—For other definitions, see Words and Phrases, First and Second Series, Proof.]

**9. Evidence ⬳314(1)—Rule as to hearsay relaxed in proving activities of large business, where witness having personal knowledge cannot be produced.**

On the matter of proving the activities of a large business, necessity compels a relaxation of the rule that a witness should speak only as to matters of personal knowledge, on which he can be cross-examined, and this necessity exists when, for any reason satisfactory to the court, the witness who can so speak cannot be found, or cannot be produced in court; the matter being one largely discretionary with the trial court.

**10. Evidence ⬳354(10)—Trustworthy contemporaneous account entries admissible.**

In a suit involving a complexity of transactions by large business concerns, if an entry be offered in evidence which is proved as part of a regular system, and is substantially contemporaneous, and concerning which no motive for falsification and no probability of negligent error is observed, there exists that reasonable guaranty of trustworthiness which warrants its reception in evidence.

**11. Evidence ⬳354(2), 376(6)—Admissible book entries must be original, and entrant must be produced.**

Inasmuch as the object of rules of evidence is to require a witness as nearly as possible to state matters of personal knowledge, on which he may be cross-examined, to warrant the admission of a book entry, the original entry and the original entrant must be produced, if possible, and the court has a large discretion in determining the circumstances under which an entry not original may be received.

**12. Evidence ⬳354(13)—Charge sheets, not time-cards, held original entries.**

A contractor's time-cards, on which were entered the hours of labor of employees, and from which the pay roll was prepared, and material requisitions on which material was drawn from the storeroom, *held* merely memoranda, and not original entries, in a suit for compensation due under a cost plus contract; the original charge sheets made up from such time-cards and requisitions being the original entries under the rule, and the bills made up therefrom being of no evidentiary value.

**13. Maritime liens ⬳65—Contract for cost plus percentage held proved by evidence, "cost" including contractors overhead.**

In an action by a contractor for labor and material furnished in converting a vessel into an auxiliary under a cost plus contract evidence *held* to warrant a finding that the contractor was to be paid on the basis of cost of labor and material plus 15 per cent.; the word "cost" meaning the actual cost, including the contractor's overhead, but he was not entitled to charge for labor more than the amount actually paid in wages plus the actual overhead.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Cost.]

Appeal from the District Court of the United States for the Eastern District of New York.

Libel in admiralty by the Morse Dry Dock & Repair Company against the bark Spica, her tackle, etc., the Susquehanna Steamship Company, as agent, etc., claimant. From a decree for libelant, claimant appeals. Decree reversed, and reference ordered to compute amount due libelant.

The Spica is an Italian vessel, whose owners, in the spring of 1918, desired to change her into an auxiliary. They were represented in the United States by a shipmaster, Capt. Figari, and with him the libelant,

a ship-repairing concern, made whatever arrangements were made. Figari had an engine originally intended for use in another sailing vessel. This engine was obtained from or through the Southwark Foundry, etc., Co., which agreed to furnish "foundation and erection drawings" for the same, and also to furnish a "superintendent of erection for the purchaser."

Libelant was undoubtedly employed to do all the rest of the necessary work and provide suitable materials. This meant designing and shipping a propeller and so changing the after body of the Spica as to permit the introduction of a propeller forward of her rudder post. There were also other repairs to be done. The work continued for upwards of 10 months, by which time libelant had presented bills aggregating $212,525.02, and the owners, through Figari, had paid $165,000. For the balance this libel was filed and it alleges that between dates specified it had, "at the special instance and request of the master and owner of said bark Spica, performed certain work, labor, and services upon the said bark necessary for the equipping of said vessel, of the reasonable value" of the gross sum above set forth.

The owners appeared, claimed, and answered, and in their answer specifically admitted the allegation above quoted, except that they denied that the "reasonable value" of the work done was as great as had been alleged. The answer then affirmatively averred that libelant undertook the work, and "to do a good and workmanlike job, all for the sum of $130,000 or less." The answer then further alleged, with considerable detail, that libelant had performed the work negligently and improperly, so that in result claimant asserted that libelant was "indebted to the said ship and to her owners in the sum of $100,000 and upwards." These new matters—i. e., the assertion of a contract for a specific amount, and libelant's alleged failure to execute the job in a workmanlike manner, are pleaded as defenses only: in form no counterclaim was interposed.

The issues thus presented were never tried by the court, but certainly without objection, and we infer by consent, it was referred to a commissioner "to ascertain and compute the amount of [libelant's] damages," and by the same order it was directed that "libelant recover herein from the bark Spica, her claimant and stipulators, the damages, if any, by it sustained by reason of the matters and things set forth in the libel." Such a document, though called an order, is in every essential an interlocutory decree on the merits.

The commissioner reported:

(1) That there was nothing in the testimony to substantiate claimant's assertion that a contract for $130,000 was made.

(2) That whatever failure in satisfactory performance the completed work displayed was due to the inability of the engine to make the necessary number of revolutions, and libelant was in no way responsible for the engine, and consequently there was no valid claim against libelant for defective workmanship.

(3) That the work had been done by charging for "day's work, labor, and material"; the prices charged being the regular market prices for such labor and material.

(4) Yet he also found that the contract between Capt. Figari and libelant was that the work should be done on the "cost plus percentage basis." By reference to the testimony, this means that libelant undertook to do the work in the same way as that pursued in the case of another vessel then at Morse's yard, viz. "cost of labor and material plus 15 per cent"; it being expressly understood that "cost includes our [libelant's] overhead expense."

The commissioner then concluded:

(5) That the prices charged were proper and the libelant was entitled to a lien on the Spica for the sum of $44,863.98, with interest from the bill last rendered.

Exceptions to this report were overruled, and claimant appealed, assigning (inter alia) for error that the contract was "to do work upon said bark upon the basis of actual cost of labor and material plus 15 per cent., whereas recovery was allowed to libelant upon the alleged theory of market or rea-

sonable value of labor and material, and recovery allowed without any proof of the work done or the value thereof."

Cass & Apfel, of New York City (Van Vechten Veeder, of New City, of counsel), for appellant.

Macklin, Brown & Van Wyck, of New York City (Horace L. Cheyney, of New York City, of counsel), for appellee.

Before HOUGH, MANTON, and MAYER, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). The pleadings in this case so disguise and obscure the issues that it will be necessary, after investigating the proof, to give decree regardless of their technicalities, on the principles stated in The Volunteer, 149 Fed. 723, 79 C. C. A. 429, and Dampskibs Thor v. Tropical Fruit Co. (C. C. A.) 281 Fed. 740.

[1] The procedure chosen in the court below for the ascertainment of facts requires some comment. We have inferred a consent to a reference, because in invitum such reference would have been illegal. The answer, however inartistic in form, proffered "on the merits" two issues: (1) The existence of a special contract for $130,000; and (2) such injury to the vessel as to wipe out all claim for further payment. Doubtless, although not specifically so authorized by rule or statute, an admiralty court may send to a commissioner or the like the ascertainment of any special set of facts; but the report is merely advisory, the power of final decision being in the tribunal to which the report is made. The City of Washington, 92 U. S. 31, 23 L. Ed. 600.

[2] But no party has a right to a reference; the court is empowered to try each and every part of every case, if so minded. United, &c. Co. v. Compagnie Generale (C. C. A.) 271 Fed. 184. And since equity and admiralty derive their respective methods from a common source, it is as true in admiralty as in equity that:

"It is not * * * competent for the court to refer the entire decision of a case to [a master or commissioner] without the consent of the parties. It cannot, of its own motion, or upon the request of one party, abdicate its duty to determine by its own judgment the controversy presented." Kimberly v. Arms, 129 U. S. 512, 524, 9 Sup. Ct. 355, 359 (32 L. Ed. 764); Garinger v. Palmer, 126 Fed. 906, 61 C. C. A. 436.

The commissioner in this case could only have proceeded to try the whole case by consent; hence our inference, we being loath to infer illegality. Result is that the decree appealed from rests on a commissioner's report, which to be sure allows a certain sum as damages, but is much more concerned in declaring why any damages are allowed, and why appellant should pay them; matters properly for the court's adjudication before assessment directed.

[3] But this decree is "vacated by the appeal," as we are recently reminded by The John Twohy, 255 U. S. 77, 41 Sup. Ct. 251, 65 L. Ed. 511, and we must therefore investigate the matter de novo. Yet a new trial on appeal in admiralty does not mean that the appellate court cannot use from the findings and proceedings below whatever makes for celerity and brevity.

[4-6] We therefore by reference to those proceedings dispose of three matters:

(1) There is no evidence that libelant and claimant ever made any contract for changing the Spica for $130,000.

(2) There is not enough evidence to enable libelant to recover as for an "account stated," by which the parties meant an agreement between Figari and libelant that the latter's bills as presented would be paid with certain inconsiderable deductions. While the reference was in progress, libelant applied to the court for leave to amend its libel, and set up such a promise. The application was denied, but we have examined the evidence without reference to this singular piece of practice or its fate.

(3) It is not proven by a fair preponderance of evidence that libelant did its work so badly, or so injured the Spica as to confer on claimant either a good defense or good counterclaim. It is true that the Spica as an auxiliary was a failure, but that misfortune was in our opinion wholly due to the engine. Whether the engine failed because of inherent vice, bad installation, or ignorance of how to operate and care for it, we cannot be certain; but for none of these faults was libelant responsible.

Beyond engine failure, claimant's charges are that due allowance was not made for the difficulty of enabling any propeller, inserted where this one was, properly to catch the water, and further that the space created for the propeller impaired the steering qualities of the Spica while under sail. As to those matters we hold that libelant did not guarantee results, and did not engage for anything but a mechanical job. But, even if more than that degree of skill was impliedly promised, the proof fails to show that Spica was not a fair merchantable piece of work. She certainly functioned as an auxiliary when supplied with another engine.

We are thus brought to the question whether libelant proved what it pleaded, a matter first to be considered without reference to claimant's attempted defenses.

[7] The libel is in form a declaration in assumpsit, seeking recovery as for quantum meruit or valebat. This is a yielding, probably unconscious, to the wonderful aggressive virility of the legal tradition that we call the common law. Yet the form of statement has directed argument along lines that have no place in the admiralty. In that scheme of jurisprudence, it makes no difference whether the common lawyer thinks the libel sounds in debt or trespass, in tort or contract, the rule of pleading is single and simple, and is set out in the twenty-second admiralty rule (267 Fed. xii), of which the sole requirement is that a libel shall "propound and allege in distinct articles the various allegations of fact upon which the libelant relies in support of his suit."

It follows that discussion of and reliance on such cases as Stephens v. Phœnix Bridge Co., 139 Fed. 248, 71 C. C. A. 374, is irrelevant. Let it be assumed that at law a contractor can maintain an action demanding quantum meruit, without any obligation to produce, as part of his own case, the contract under which he worked; it remains true

(1) that the admiralty takes his words of pleading merely as the allegation of a fact which, if proven, is thought to support suit; and (2) that under no system of law can the form of pleading enable any contractor to escape from a valid contractual obligation.

. Whether on this point of pleas at law the statements of Hawkins v. United States, 96 U. S. 689, 697, 24 L. Ed. 607, can be wholly reconciled with Dermott v. Jones, 2 Wall. 1, 9, 17 L. Ed. 762, and Hubbard v. Investment Co., 119 U. S. 696, 701, 7 Sup. Ct. 353, 30 L. Ed. 548, is a nice matter of no present importance; but it may be noted that in the Stevens Case, plaintiff's object in choosing to declare for a quantum meruit was to prevent even an apparent variance between allegations of assumpsit and substantial performance, and proof of a formal written contract containing penalty clauses. This procedure left defendant to introduce the contract, which, when produced, was given as much effect as the law ordinarily gives to penalty clauses; i. e., an opportunity to prove actual damage. But the contract was given its legal measure of validity.

The common instance of the same result in the admiralty is to sue for cargo loss with a bald statement of shipment received in good order and delivered in bad, leaving it to the party defending to introduce the bill of lading; but no one has ever doubted that, once produced, the bill governs the relation of parties.

As a further preliminary to the inquiry whether libelant proved what it pleaded, we must again insist on admiralty's freedom from the formal and technical trammels of the common-law rules of evidence. The Rosalia (C. C. A.) 264 Fed. 285, 289. The citations made in that case show that the admiralty has always exercised freedom in respect of evidence, being often satisfied with "half proof," instead of demanding the "full proof" of its civil-law origin. But the same history and same reasons equally justify the freedom from common law shackles above asserted.

Nevertheless, in a day and country where the same counsel and judges administer law, equity, and admiralty, it is most desirable that even the historic freedom of admiralty should pursue that system of fact finding which is deemed by leaders in legal thought best suited to current conditions of human activity.

What libelant produced as proof was this: The first witness was a high officer of the Morse Company, who confessedly had no personal knowledge of any detail either of work or accounting. He identified the bills rendered and stated that they were made upon the basis of "day's work, labor, and material." Of the system by which the items of such work, etc., were recorded, he said nothing, except that the said bills were made up in the usual way, whereupon copies of the bills were offered in evidence. They are the usual shipyard bills, similar to the specimen printed in The Norma, 68 Fed. 509.

Libelant then produced an employee who was "in charge of the billing department." He said that the bills in evidence had been compiled under his supervision from what he called "charge sheets," which were documents prepared in the cost department and contained the daily charges against the Spica. Apparently these charge sheets were

produced, as papers so called were marked for identification; but they were never put in evidence and are not contained in the apostles.

This witness testified to the system, viz. that each workman received a "time-card" on reporting for work, and he entered thereon, e. g., that he had worked for so long a time on the Spica. He might labor on several different jobs during the day, and it was his business to enter each piece of work on the card. When he knocked off, his card was signed by his foreman and dropped in a box, with many others. Libelant had many hundreds of men whose time and labor were thus recorded. Materials as wanted were obtained from store, by a foreman filling out a requisition for same, sending it to the storekeeper, who had the requisition receipted by whomsoever took the articles, and kept the requisition, which also showed the "job" for which the material was wanted.

At convenient times, apparently daily, these workmen's cards and the requisitions were turned into the cost department, where clerks examined the time-cards to see that they had been signed by the proper foreman. Whether the requisitions for material were subjected to any similar criticism does not appear. From the time-cards the pay rolls of the laborers were prepared, and from both cards and requisitions were (e. g.) obtained the items put on the Spica's charge sheets, which then went to the billing department.

The employee in charge of the clerks who made up the charge sheets was also produced. He confirmed the above statement of system, and produced a large number of time-cards which also were marked for identification, but never put in evidence. This witness was asked whether the cards and charge sheets "compared correctly," and replied, "They do;" but it nowhere appeared that he personally, or any other witness, made any entry, even on the charge sheets not in evidence, much less on the bills in evidence. No books of account of any kind are referred to in the testimony, other than the papers or documents above described. This is the whole case.

[8] The proof attempted, the kind of business concerned, and the methods of recording expense and performance exhibited, combine to render appropriate some further consideration by an admiralty court of how the reasonable cost of executing by very numerous employees a large piece of work can be proved; and by proof (in its large sense) is meant, satisfying fair men by fair means of what was done, having regard to lapse of time, kind of work, and multiplicity of necessary agencies.

This court has twice spoken on this question, as exemplified by ship repairing, in The Norma, supra, and The Maryanne, 262 Fed. 129. That the proofs here offered are insufficient under those decisions is apparent, because no one even offered to prove that the time-cards and requisitions were correct when made. If those cases are to be taken literally, it would be enough to say that libelant had failed because the foremen did not testify; and the inference might be that, were the foremen called, or if they testified, as they did in The Maryanne, and did not in The Norma, the law would be satisfied.

But this would fail to answer the question as to how to prove rea-

sonable cost under modern conditions. Courts must recognize changing times, and the shipyard of The Norma, supra, is as antiquated as that vessel would probably be, could she emerge from it to-day. Both the cases last cited were confessedly guided by Mayor, etc., v. Second Avenue R. Co., 102 N. Y. 572, 7 N. E. 905, 55 Am. Rep. 839, where, after much travail, Andrews, J., was of opinion that "the rule as to the admissibility of memoranda may properly be extended to embrace" a case where witnesses deposed that they gave true statements to one who recorded same, and the record was produced and identified after the speakers had forgotten what they told the recorder. We think that nowadays that creditable extension may itself be extended.

This case seems to us to furnish an opportunity of applying to a matter peculiarly of admiralty cognizance the principles stated in the fifty-first chapter of Wigmore on Evidence, §§ 1517–1558. We recognize the fundamental similarity between the exception to the hearsay rule as to parties' books, and that as to regular entries (1517); but in this case we are not aware that libelant kept any books, as that phrase has been used in legal history. We do consider the admissibility of entries by the party's clerks or employees.

[9] The rule must always be adhered to that, unless necessity compels, a witness should speak only as to what he can be cross-examined on; but in the matter of proving the activities of a large business that necessity exists, and it exists when for any reason satisfactory to the court the witness who can so speak cannot be produced in court. Death, insanity, or absence from the jurisdiction have all been recognized as good reasons; but we also recognize as an admissible excuse for nonproduction mere inability by reasonable effort to find the man or men who could speak with personal knowledge. Section 1521. This is a matter in which large discretion should remain with the trial court. Section 1530.

[10] If, then, an entry be offered which is proved as part of a regular system, which is substantially cotemporaneous, and concerning which no motive for falsification or probability of negligent error is observed, there exists that reasonable guaranty of trustworthiness which is the second ground of admission of regular entries. Sections 1522–1527. Thus we accept it as a rule, flexible in the reasonable discretion of the court that sees the men concerned in the business and hears evidence as to the necessities of the situation, that no objection, based on the exclusion of hearsay, exists to the admission of an entry made by one person in the regular course of business, recording an oral or written report, made to him by one or more other persons in like regular course, of a transaction lying in the personal knowledge of the latter, if necessity and trustworthiness as above outlined be shown to exist. Section 1530.

[11] The object always is to get as near to original cross-examinable statements as is reasonably possible under the circumstances; therefore what is called the "original entry" is always insisted on, if possible, and the original entrant must be produced, if also possible. Section 1532. How far an entry, certainly not original, may be received is matter of degree. Discretion here properly has large play.

The point is not presented by this record, but for an extreme case (though of parties' books) see Givens v. Pierson's Administratrix, 167 Ky. 574, 181 S. W. 324, Ann. Cas. 1917C, 956, a decision openly adopting Dean Wigmore's views of legal propriety.

Apply this procedure to the matter in hand. That necessity existed for offering entries rather than the workmen who signed cards may be assumed rather than found. There is small evidence, though we have no doubt of the fact. But there is no evidence at all as to why the foremen who requisitioned the material were not produced, if the requisitions are the original entries. Still less is there any evidence as to why the clerks who allocated items to the Spica's charge sheets and made the entries thereon were not called.

[12] We therefore inquire, What are the original entries in this case? As to labor charges, we agree with Wisconsin Co. v. Maryland Co., 203 Fed. 403, 121 C. C. A. 507,[1] that the time-cards are memoranda only; the charge sheet was the original entry. To the same effect, Diament v. Colloty, 66 N. J. Law, 295, 49 Atl. 445, 808. This ruling gives an illustration of what is meant by trustworthiness. These time-cards were the basis, not only for job charge sheets, but pay rolls; and if the men were paid on them, it is a reasonable inference that they were kept as favorably to the employer as circumstances permitted.

As to the material requisitions, we are also of opinion that the charge sheet was the original entry and the requisitions memoranda; but considering the vital necessity of showing the propriety of using ship material, and the lack of knowledge of accountants as to such matters, the trustworthiness test would probably require the production of the requisitioning foremen, or at least of enough of them to evidence their reliability as a class. This seems to have been the course pursued in Matson, etc., Co. v. United, etc., Works, 213 Fed. 293, 129 C. C. A. 639, a case which cites with apparent approval the Wisconsin Co. decision, supra. That the entrants on the charge sheets should have been produced, or their attendance shown to be impossible, is quite clear. It is, of course, obvious that the bills, the only documents actually in evidence, are not entries, original or derivative. They are demands on the customer.

There is a third and not inconsiderable class of charges in libelant's bills, as to which the evidence is silent; i. e., expense for tugs in towing and shifting. No reason is shown in the apostles why such items should not be proven without any recourse to hearsay. The matter was probably overlooked. Result is that we now recognize, on proof of necessity and trustworthiness, the admissibility of original entries regularly and cotemporaneously kept in a regular business and pertaining to that business. We emphasize the word "admissible"; we are not speaking of the probative value of that which is admitted; such value will always vary with the circumstances of every litigation.

The result intended is to give to vendors and contractors, in a way of business requiring many and shifting workmen, and complex accounting systems, an opportunity of making prima facie proof in ac-

---

[1] This case is an effort to follow Wigmore, § 1530, which is erroneously cited as 1730.

cord with the business habits of the times; further to impose on the trial court the duty of deciding whether necessity and trustworthiness have been established as the prerequisites of admissibility; and finally to leave to the fact triers, whether judges or juries, the question of credibility, no matter what apparatus of papers may constitute the resulting evidence. This is an intended advance on The Norma, supra, a relaxation of the methods used (it does not appear they were imposed) in the Matson Case, supra, and an agreement with the Wisconsin Co. Case, supra, as far as that decision was required to go. Earlier cases, suggestive of the coming of the rule contended for by Dean Wigmore, are Northern, etc., Co. v. Keyes (C. C.) 91 Fed. 47, and United States, etc., Co. v. Venable (C. C.) 124 Fed. 267.

This branch of legal administration ought not to be regarded as capable of fixation, any more than are the business habits out of which it grows. At present we think the foregoing furnishes to large employers, performing complicated work by many hands, a reasonable means of proving to fair men by fair means what they have done and how much it cost to do it. It is clear that libelant did not produce admissible evidence, and for that reason the decree appealed from must be set aside.

[13] The claimant's present contention that the bargain between parties was for cost plus 15 per cent. (cost to include overhead) is borne out by the commissioner's finding, which we adopt; the evidence consists of an interchange of letters containing no ambiguous expressions. The entry of decree below, after this finding in a confirmed report, can only be explained by the admission above noted in the answer. As we have now held that even with the admission the case was not proved, we shall dispose of the litigation on the basis of a claim as proved. A repleader on this appeal would be formally correct, but in so plain a matter may be and is waived.

The meaning of cost is too clear for exposition; it means actual proved cost to contractor. Buck v. Burk, 18 N. Y. 337; Bull v. Quincy, 155 Ill. 566, 40 N. E. 1035. To this is to be added such a rate for overhead expenses as may be proven. This word or phrase has received a great deal of attention of late years in rate-making cases. Sufficient guidance for the purposes of this litigation will be found in Consolidated, etc., Co. v. Newton (D. C.) 267 Fed. 231, 253–259. To the total of cost and overhead should be added the 15 per cent. profit contracted for.

One illustration may be taken from the evidence before us as showing the wide possible divergence between what libelant asserted and tried to prove and what the evidence showed it contracted to do. Capt. Figari complained that one of the items in the bill was a charge for the labor of certain men at $10.60 per day of 8 hours, when the amount actually paid each man was 82 cents an hour or $6.56. Such a charge obviously contains both overhead and profit. It is true that in a certain sense cost includes overhead, but by this contract libelant agreed in effect to charge for such a laborer what was actually paid the man plus a reasonable overhead and plus 15 per cent. That meant, among other things, that it was necessary to prove the overhead. Li-

belant is entitled to compute 15 per cent. on the aggregate of actual cost and overhead cost; the contract was worded as being cost to include overhead plus 15 per cent.

It is ordered that this cause be referred to William Parkin, Esq., as special commissioner, to ascertain what was the actual cost to libelant of doing the work on the steamer, and what is a reasonable overhead addition thereto, and to compute the amount recoverable by libelant in accordance with the principles hereinabove set forth; all questions of costs, both in this court and the court below, to await the coming in of the report.